IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-00911-WYD-CBS

MERCURY COMPANIES, INC., AMERICAN HERITAGE TITLE AGENCY, INC. D/B/A/ FIRST AMERICAN HERITAGE TITLE COMPANY OF DENVER, SECURITY TITLE GUARANTY CO., TITLE AMERICA, INC., and UNITED TITLE COMPANY, INC.

    Plaintiffs,

v.

THE FIRST AMERICAN CORPORATION and FIRST AMERICAN TITLE INSURANCE COMPANY,

    Defendants.

---

THE FIRST AMERICAN CORPORATION and FIRST AMERICAN TITLE INSURANCE COMPANY,

    Counterclaimants,

v.

MERCURY COMPANIES, INC., AMERICAN HERITAGE TITLE AGENCY, INC. D/B/A/ FIRST AMERICAN HERITAGE TITLE COMPANY OF DENVER, SECURITY TITLE GUARANTY CO., TITLE AMERICA, INC., and UNITED TITLE COMPANY, INC.

    Counterdefendant.

---

**THE FIRST AMERICAN CORPORATION'S AND FIRST AMERICAN TITLE INSURANCE COMPANY'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION ENJOINING SALE OF COLORADO OPERATIONS OF MERCURY COMPANIES, INC. AND CERTIFICATION UNDER D.C.COLO.LCivR 65.1(A)**

---

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and D.C.COLO.LCivR 65.1(A), Defendants and Counterclaimants First American Corporation ("FACO") and First

{00586721 / 1}

American Title Insurance Company ("FATICO") (collectively, "First American") hereby apply for a temporary restraining order and order to show cause re: preliminary injunction enjoining Counterdefendants Mercury Companies, Inc., American Heritage Title Agency, Inc. D/B/A/ First American Heritage Title Company Of Denver, Security Title Guaranty Co., Title America, Inc., and United Title Company, Inc. (collectively, "Mercury") and Fidelity National Financial, Inc. ("Fidelity"), their subsidiaries, affiliates, agents, employees, officers, attorneys, and those acting in concert with them, as follows:

1. First American requests an order that Counterdefendants Mercury show cause at a date and time to be set by the Court in August 2008, or as soon thereafter as the matter may be heard, why each of them, their subsidiaries, affiliates, agents, employees, officers, attorneys, and those acting in concert with them, should not be enjoined as follows, during the pendency of this action:

    a. Mercury shall not transfer any assets or operations to Fidelity;

    b. Mercury shall not take any acts in furtherance of any agreement to sell any assets or operations to Fidelity;

    c. Fidelity shall not recruit or solicit any Mercury employee to join any Fidelity company, and Mercury shall not seek to induce any Mercury employee to join any Fidelity company;

    d. Mercury shall not transfer any trust accounts or funds in trust accounts to any Fidelity company;

    e. Mercury shall not transfer any title or escrow transaction or order to any Fidelity company;

    f. Mercury shall not enter into any transaction for the transfer or sale of any of its assets outside the ordinary course of business without the written consent of FACO.

  2. Immediately, and pending hearing on a preliminary injunction, First American requests that the Court restrain and enjoin Mercury, and their subsidiaries, affiliates, agents, employees, officers and attorneys, and all those acting in concert with them, as follows:

    a. Mercury shall not transfer any assets or operations to Fidelity;

    b. Mercury shall not take any acts in furtherance of any agreement to sell any assets or operations to Fidelity;

    c. Fidelity shall not recruit or solicit any Mercury employee to join any Fidelity company, and Mercury shall not seek to induce any Mercury employee to join any Fidelity company;

    d. Mercury shall not transfer any trust accounts or funds in trust accounts to any Fidelity company;

    e. Mercury shall not transfer any title or escrow transaction or order to any Fidelity company;

    f. Mercury shall not enter into any transaction for the transfer or sale of any of its assets outside the ordinary course of business without the written consent of FACO.

  First American bases this application on this Motion, the pleadings on file in this action, the accompanying Affidavits of Kevin Lagerwey and Parker Kennedy, the Information for Temporary Restraining Order filed pursuant to D.C.COLO.LCivR. 65(C), any matters of which the Court may take Judicial Notice, the arguments of counsel, and such other matters as the Court may deem appropriate.

## PRELIMINARY STATEMENT

The relief sought by this Motion could not be more straightforward: Several years ago, Mercury Companies, Inc. (Mercury) signed a Preferred Stock Purchase Agreement with The First American Corporation (FACO). To protect FACO's rights as a preferred shareholder and underwriter of Mercury's companies, Mercury promised that it *"will not . . . convey, sell lease or otherwise dispose of (or agree to do any of the foregoing at any future time) all or any significant part of its property or assets without the written approval of FACO."* [emphasis added] Mercury has stunned First American by breaching that agreement in the most egregious way imaginable. This week, just as First American finalized months of negotiations with Mercury with an agreement in principle under which Mercury would sell its core remaining assets – Mercury's Colorado operations – to First American, Mercury abruptly agreed to sell those operations to First American's biggest competitor, Fidelity National Financial, Inc. (Fidelity). Since **Mercury did not seek or receive FACO's consent to enter that transaction with Fidelity**, as it was required to do, by this application First American asks the Court to enforce Mercury's agreement by enjoining Mercury from performing its unauthorized agreement with Fidelity.

That is not the only promise broken by Mercury's attempted sale to Fidelity. Mercury's Articles of Incorporation prohibit it from taking any action that would significantly diminish preferred shareholders' rights unless at least 51 percent of the preferred shareholders approve that action in writing. Mercury's purported Fidelity deal threatens to vitiate FACO's preferred stock rights, yet again, Mercury did not obtain FACO's consent. Finally, Mercury's unauthorized attempt to sell its assets violates the rights of FATICO, which is a major equitable shareholder of Mercury common stock and therefore under Colorado law has a right to approve

4

major corporate transactions such as a sale of substantially all the assets of the company. Mercury's deal to sell its remaining viable assets to Fidelity is an attempt to end-run this basic FATICO right as a major Mercury shareholder, and it must be enjoined.

    First American's rights will be irrevocably injured if the Court does not enjoin Mercury's attempted sell-off to Fidelity. Mercury is at a crossroads. It has to make payroll tomorrow, Thursday, August 7. It does not have the cash to do so. First American – which is the exclusive underwriter of all title insurance policies issued by Mercury – has fully negotiated a deal with Mercury that will allow Mercury to make payroll, and will ensure First American's stewardship of the Colorado operations in the difficult days and months ahead. If, despite First American's rights, a deal with Fidelity proceeds, and Fidelity takes over Mercury's Colorado operations, it will be impossible for First American to manage the operations, and extraordinarily disruptive to employees and customers to later try to undo the integration of those operations into Fidelity. Moreover, Fidelity will seek at the first available instance to sever the Colorado subsidiaries' existing agreements with First American and minimize First American's rights as a preferred and common stockholder in Mercury. There will be no way to compensate First American for the prejudice to its rights.

    The bottom line is that First American in providing Mercury nearly $100 million of financing over this decade, bargained for and obtained the right to approve, and reject, any Mercury proposals to sell significant assets. Unless Mercury's attempted sale of its remaining profitable operations to Fidelity is enjoined, First American will have been deprived of this most basic contract right to its immediate and permanent detriment, while Mercury and Fidelity will

5

enjoy an immediate and commensurate windfall. The Court's equitable powers exist precisely to make sure such an injustice does not occur.

## FACTS

**A.     First American's History Of Generous Financing Of The Mercury Companies**

FATICO is one of the largest U.S. title insurance underwriters. Its parent, FACO, also owns a variety of other businesses in the real estate information business. As a title insurance underwriter, FATICO's core business consists of insuring against risks in title to property acquired by purchasers, and to liens of real property lenders. Title insurance business comes to FATICO through two principal channels: (1) direct operations, in which a FATICO owned office performs the title search and then issues a FATICO title insurance policy; and (2) agency operations, in which an independent company, known as an "underwritten title agent," pursuant to an Underwriting Agreement with FATICO performs the title search, issues a FATICO title insurance policy, and remits a portion of the title insurance premium to FATICO. As a result of a long relationship between the top executives of the companies, for more than a decade, Mercury – through more than a dozen Underwriting Agreements between Mercury's subsidiary operating companies and FATICO – has been FATICO's biggest agent.

**B.     2000: Mercury Receives $5 Million Debt Relief From FACO and Promises Not To Enter Into Any Sale or Other Transaction Disposing of Mercury Assets**

The Mercury-First American relationship has gone well beyond agent-underwriter. Since 2000, Mercury has repeatedly turned to First American for financing. In the first half of this decade, First American provided more that $22 million in financing to Mercury.

In particular, in 2000, FACO acquired 5,000 shares of Mercury Series B Preferred Stock in exchange for forgiveness of $5 million in past due underwriting remittances. *See* 2000

Preferred Stock Agreement, attached as Exh. A to Affidavit of Parker Kennedy (Kennedy Aff.).

In addition to issuing the 5,000 shares of Series B Preferred stock, Mercury also promised that:

> The Company [Mercury] will not acquire any business entities, wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of (or agree to do any of the foregoing at any future time) all or any significant part of its property or assets without the written consent of FACO. [2000 Preferred Stock Agreement, Section 8.3, at 11]

Because First American had bargained for the right to be Mercury's exclusive underwriter and invested substantial amounts into Mercury, this provision protected First American's investment by ensuring that Mercury could not simply transfer away the value of the investment without First American's consent. *See* Kennedy Aff., ¶ 4.

First American also has other rights under Mercury's Articles of Incorporation, such as Article IV.J., which provides that:

> Unless at least Fifty-One Percent (51%) of the then holders of the Preferred Stock approve in writing, the corporation [Mercury] shall not unreasonably take any action with respect to the corporation which would have the effect of significantly diminishing the rights of said holders to receive the Preferred Dividend . . . [Exhibit D to Affidavit of Kevin Lagerwey (Lagerwey Aff.)]

Thus, the Articles reinforced the need for shareholder approval of any transactions that could impact shareholders' rights.[1]

Thereafter, First American provided more money to Mercury. In 2003, FATICO lent Mercury $2.6 million, memorialized in a 2003 Promissory Note, so that Mercury could acquire the majority ownership of Investors Title Company, which became a California (indirect) subsidiary of Mercury. *See* Lagerwey Aff. ¶ 5 and Exh. A. In 2004, FATICO lent Mercury an

---

[1] Also, Article IX.D.4 of the Articles makes plain that any sale or other disposition of all or substantially all of the property and assets of the corporation shall be deemed a dissolution, triggering FACO's liquidation rights as set forth in Article IX.D.1. *See* Exh. D to Lagerwey Aff. Mercury could not make any distribution without also violating this requirement.

7

additional $15 million, and again the parties memorialized the debt in a Promissory Note. *See* Lagerwey Aff., ¶ 6 and Exh. B.

### C. Mercury Eagerly Receives $75 Million From FATICO And In Return, Issues 75,000 Shares Of Preferred Stock Convertible Into Mercury Common Stock

As the residential real estate market enjoyed its remarkable upward run through the present, Mercury expanded rapidly, and Mercury and FATICO began discussing larger contributions to Mercury's finances. Those discussions culminated in a deal where FATICO's financing to Mercury *quadrupled* in one fell swoop. In June 2006, Mercury and FATICO signed a 2006 Preferred Stock Agreement. *See* Lagerwey Aff., ¶ 7 and Exh. C. Pursuant to that Agreement, FATICO provided $75 million cash to Mercury, Mercury amended its Articles of Incorporation to create a new class of preferred stock ("Series B Non-Voting Preferred Stock"), and Mercury issued 75,000 shares of the Series B Non-Voting Preferred Stock to FATICO. *Id.*[2]

Under Mercury's Amended Articles, Mercury had the right to redeem the entire 75,000 shares of Series B Preferred Stock (i.e., pay back the $75 million) on or before June 30, 2007, a date that was extended by the parties to September 30, 2007. *See* Lagerwey Aff., ¶ 7 and Exh. C (October 5, 2006 letter agreement). If Mercury did not exercise its right to redeem the preferred stock by the deadline, then the preferred stock "automatically converted" into Mercury Class A Common Stock. *See* Lagerwey Aff., Exh. C (Articles of Amendment, at 3).[3]

---

[2] The 2006 Preferred Stock Agreement also provided that the 5,000 shares of Series B Preferred Stock issued in 2000 was converted to 5,000 shares of Series A Preferred Stock. *See* 2006 Preferred Stock Agreement, Lagerwey Aff., Exh. C at 3.

[3] The automatic conversion, in essence, simply required an agreement regarding, or determination by appraisal of, the "Company Value" of Mercury as of the conversion date, then straightforward math to determine how many shares of Mercury Class A Common Stock that FATICO's Preferred Stock would convert into, given Mercury's Company Value.

8

D. **Mercury Breaches Its Agreements With First American And First American Becomes A Majority Shareholder**

As everyone knows, the recent volume of residential real estate transactions has dropped considerably. This is the life-blood of Mercury's business. As a consequence, Mercury changed its financing with First American from voluntary to involuntary: Mercury ceased making preferred stock dividend payments, it defaulted on its Promissory Notes, and its operating subsidiaries across-the-board breached their obligations to remit premiums owing to FATICO under the Underwriting Agreements. *See* Lagerwey Aff., ¶ 9.

Mercury also did not pay FATICO $75 million – or any other amount – to redeem FATICO's Series B Preferred Stock as of September 30, 2007. *See* Kennedy Aff., ¶ 4. That meant FATICO's Preferred Stock automatically converted to Mercury Voting Common Stock, but Mercury did nothing to implement that conversion. *Id.*; Lagerwey Aff., ¶ 10. Therefore, by straightforward operation of Mercury's Articles, that stock converted into Class A Common Stock as of September 30, 2007. *See* Kennedy Aff., ¶ 6. Although the mathematical process of determining the exact number of shares of Class A Common Stock that FATICO owns has not been performed yet, the only evidence, as of September 20, 2007, indicates that based on its $75 million payment, FATICO is a major, perhaps the majority, common shareholder of Mercury. *Id.*; Lagerwey Aff., ¶¶ 10, 13(b).

E. **First American Reaches a Deal With Mercury But Mercury Suddenly Reneges and Strikes A Deal With First American's Competitor**

Over recent months and weeks, Mercury has shut down essentially all of its title operations except for those in Colorado. *See* Lagerwey Aff. Ex. F. Because of the long-term relationship between the parties and First American's recognition that Mercury was suffering financially, First American sought for many months to negotiate an overall solution to Mercury's

9

many breaches and the parties' various relationships. *See* Kennedy Aff., ¶ 2. The negotiations were ongoing as recently as the weekend of August 2nd and 3rd, and late in the day on Monday, August 4, 2008, Mercury and First American reached a deal in principle on all key issues. Kennedy Aff., ¶ 2; Lagerwey Aff., ¶ 11. Among other things, First American would acquire certain core operating assets and assume certain operating liabilities of Mercury's Colorado operations, while agreeing not to enforce Mercury's $20 million debt. *Id.*

But just as this was occurring, Mercury's CEO, Jerry Hauptmann, advised that First American's chief competitor, Fidelity, had inquired about a deal. Kennedy Aff., ¶ 2. The next day -- without any hint from Mercury – First American was stunned to see a Fidelity press release indicating it had agreed to purchase Mercury's Colorado operations. *See* Kennedy Aff. ¶ 7; Lagerwey Aff., ¶ 12. First American did not consent to any such deal at any time. *See* Kennedy Aff., ¶ 5. The only deal that First American approved was the agreement that First American negotiated with Mercury as of August 4th. *Id.*

Mercury has indicated that it does not presently have sufficient money to make payroll tomorrow, Thursday, August 7. *See* Lagerwey Aff. ¶ 15. But First American – which is the exclusive underwriter of all title insurance policies issued by Mercury – has fully negotiated a deal with Mercury that it is ready, willing and able to perform. The deal will allow Mercury to make payroll, and provide First American's support in the weeks and months ahead. *Id.*

## LEGAL ANALYSIS

**A.   The Court Has Broad Authority To Issue Enjoin Conduct When The Moving Party Is Likely To Prevail On The Merits and Irreparable Injury Is Threatened**

Federal Rule of Civil Procedure 65 sets out the factors the Court should consider when deciding a motion for injunctive relief:

10

    1)    whether the movant has shown a reasonable probability of success on the merits;

    2)    whether the movant will be irreparably injured by denial of relief;

    3)    whether granting preliminary relief will result in even greater harm to the nonmoving party; and

    4)    whether granting the preliminary relief will be in the public interest.

*Summmum v. Pleasant Grove City*, 483 F.3d 1044, 1048 (10th Cir. 2007); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 879 (3d Cir. 1997).

The Court need not apply these factors in a rigid way. Rather, to prevail, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted, or (2) the existence of serious questions pointing to the merits and that the balance of hardships tips in its favor. *Metro Publishing Ltd. v. San Jose Mercury News*, 987 F.2d 637, 639 (9th Cir. 1993). These are not separate tests, but rather "opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.'" *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987) (citations omitted). First American readily satisfies all of these factors here on its claims.

**B.**    **First American Will Prevail On the Merits Of Its Claims That Mercury Failed to Obtain First American's Approval of Mercury's Transaction With Fidelity**

First American has much more than a likelihood of success on the merits in this case. Because First American's rights flow directly from Mercury's express written arguments and its Articles, First American's victory is a virtual certainty. The proposed Mercury-Fidelity deal violates at least three of Mercury's independent and equally effective obligations to First American: FACO's rights under the express terms of the 2000 Preferred Stock Agreement,

11

FACO's rights under Mercury's Articles regarding preferred stockholder rights, and FATICO's rights as a common stockholder to approve major corporate deals.

First, the 2000 Preferred Stock Purchase Agreement expressly and unequivocally states that Mercury cannot sell its assets unless First American approves in writing:

> The Company [Mercury] will not acquire any business entities, wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of (or agree to do any of the foregoing at any future time) all or any significant part of its property or assets without the written consent of FACO.

Fidelity and Mercury have announced that Mercury has agreed to sell its Colorado operations to Fidelity. The Colorado operations are essentially all that remains of Mercury, so they represent much more than a "significant part of its property or assets." But Mercury did not seek, much less receive FACO's written consent. This ends the inquiry.

Second, as established by its Articles, Mercury is legally obligated to obtain written approval from 51% of the Preferred Stock holders before it could enter into any deal that would affect the Preferred Stockholders' interests. Here, the deal with Fidelity would certainly affect the interests of the Preferred Stockholders. Mercury itself acknowledges that, while it has closed operations in Arizona, Texas and California, its "Colorado-based companies have remained profitable." Exhibit F to Lagerwey Declaration. Mercury has thus purported to sell to Fidelity its only profit-making assets. First American's interest as a preferred shareholder is first and foremost to receive dividends. That interest is irrevocably impaired if Mercury sells away its only income-producing assets. The deal thus required FACO's approval, and Mercury did not obtain it.

Finally, under the 2006 Preferred Stock Agreement and Mercury's Articles of Incorporation, FATICO's Preferred Stock automatically converted to Common Stock. FATICO

12

therefore has equitable rights of a major voting common shareholder of Mercury. Colo. Rev. Stats. § 7-112-102(1) provides: "A corporation may sell, lease, exchange, or otherwise dispose of all, or substantially all, of its property, with or without its good will, other than in the usual and regular course of business . . . if the board of directors proposes *and the shareholders approve the transaction*." (Emphasis added). Mercury's Fidelity deal proposes to sell substantially all of its property, but Mercury has not sought any shareholder approval of that deal. That deal therefore violates FATICO's most basic rights as a shareholder, and is unenforceable for lack of proper corporate authority.

C.  **If The Court Does Not Enjoin Mercury From Selling Its Colorado Operations to Fidelity, First American Will Suffer Irreparable Injury**

The second factor also weighs heavily in favor of First American. Courts have found irreparable harm arising from the sale of a company or its assets. *See, e.g., Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351 (10th Cir. 1986) (granting plaintiff's request to enjoin defendant from selling its operations to a third party where defendant had ongoing business relationship with plaintiff). Here, irreparable harm is a certainty if the Court does not enforce First American's right under the Preferred Stock Agreement, enforce First American's rights as a stockholder, and enjoin Mercury from performing its agreement to sell its Colorado business to Fidelity.

The right to approve or veto certain transactions is significant, and courts have held that the loss of such a right can constitute irreparable harm. *See Wisdom Import Sales Co., LLC, v. Labatt Brewing Co.,* 339 F.3d 101 (2d Cir. 2003). In *Wisdom*, where a joint venture partner sued to enforce its veto rights, the Court found: "... Wisdom expressly negotiated for and received the right to veto certain transactions with which it disagreed before those transactions commenced, a

13

right that is irretrievably lost upon breach, and may not be compensable by non-speculative damages. The only way to render the provision truly viable is to enforce it." 339 F. 3d at 114. *See also, CDC Group PLC v. Cogentrix Energy, Inc.*, 354 F.Supp. 2d 387 (S.D.N.Y. 2005) (finding irreparable harm would occur if injunction did not issue to prevent defendant from transferring its majority interest in a subsidiary to a third party).

Likewise, the rights of a shareholder to manage and control the company are immeasurable in value. "Courts have consistently found that corporate management subjects shareholders to irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors." *International Banknote Co. v. Muller*, 713 F.Supp. 612, 623 (S.D.N.Y. 1989). *See also, AHI Metnall, L.P. by AHI Kansas, Inc. v. J.C. Nichols Co.*, 891 F.Supp. 1352 (W.D.Mo. 1995) (finding irreparable harm would occur to plaintiff if annual shareholder meeting was not postponed because it would completely frustrate any attempt to exercise right of shareholder to nominate directors or propose items of business); *Beztak Co. v. Bank One Columbus*, 811 F.Supp. 274, 283-84 (E.D. Mich. 1992); *ER Holdings, Inc. v. Norton Co.*, 735 F.Supp. 1094, 1101-02 (D.Mass. 1990); *Treco, Inc. v. Land of Lincoln Savings & Loan*, 572 F.Supp. 1447, 1450 (N.D. Ill. 1983).

Here, First American bargained for the contractual and equitable right to approve any sale of Mercury and it will suffer irreparable harm without those rights. If any company other than First American operates Mercury's Colorado title agency operations, Mercury's Colorado operations would depart immediately and irrevocably on a different course than that on which First American would set those operations. *See* Kennedy Aff., ¶ 7-8; Lagerwey Aff., ¶ 15. First

14

American cannot be made to stand by while Mercury's present management is making decisions on these key issues, when First American should have control of Mercury and any deal that Mercury is trying to strike. The consequences of decisions made by Mercury's present management, of course, cannot be undone once taken. Quite simply, there will be no way to determine the true extent of the damage to First American if Mercury is permitted to strike the deal with Fidelity.

**D.     The Public Interest Favors The Injunctive Relief Sought By First American**

First American recognizes this is a dispute between shareholders of a private company, so the public interest component of Rule 65 does not figure as prominently in this application as it would in other circumstances. To the extent the public interest is a factor, it weighs in favor of the relief sought by First American. First American's application – which simply asks Mercury to comply with its own contractual agreements and its Articles – "furthers the legitimate public interests of corporate democracy and participation by shareholders in the management of corporations which they have an interest." *Treco, Inc.*, 572 F.Supp. at 1450 (granting preliminary injunction and requiring savings and loan association to convene special meeting of shareholders for purposes of amending bylaws to permit cumulative voting).

**E.     The Equities Overwhelmingly Favor First American And Justify The Injunctive Relief That First American Seeks**

First American's request is not extraordinary. Fundamentally, it asks the Court to require Mercury to comply with the express requirements of the 2000 Preferred Stock Agreement, Mercury's own Articles, Mercury's statutory duties to its shareholders. It is entirely equitable to hold Mercury to its bargain, the provisions of its governing changes, and the law. Mercury might complain that it will lose a deal, but that is exactly what Mercury agreed could happen

when it struck the 2000 Preferred Stock Agreement with First American. Asking Mercury to meet its obligations is hardly unjustified – indeed, it is only fair to prohibit Mercury from striking a new deal with First American's competitor after First American had already agreed to a deal in principle with Mercury.

Conversely, if the Court were to *decline* the relief sought by First American here, the impact to First American would be far-reaching and prejudicial. If the Court does not enforce Mercury's promises and obligations, then First American would effectively be without a remedy, and would be permanently deprived the benefit of the bargain: Mercury would have benefited from nearly $100 million in financing from First American, whereas First American would be powerless to exercise the core rights it obtained in the deal – the right to control any sale of Mercury and its assets, and the right to control Mercury's decisions to the extent it would impair First American's rights. If Fidelity's deal remains in place, it will be immediately performed, the Colorado operations will be integrated into Fidelity, and it will be impossible to unscramble the egg. First American's rights will have been completely frustrated, and First American will have no remedy coming close to what it bargained for and what Mercury promised.

## CONCLUSION

Only an injunction can give First American the benefit of its bargain and prevent a major windfall to Mercury and Fidelity. Accordingly, the Court should prohibit Mercury and Fidelity from: transferring any Mercury assets or operations to Fidelity; taking any acts in furtherance of any agreement to sell any assets or operations to Fidelity; recruiting or solicit any Mercury employee to join any Fidelity company; trying to induce any Mercury employee to join any Fidelity company; transferring any trust accounts or funds in trust accounts to any Fidelity

company; transferring any title or escrow transaction or order to any Fidelity company; and entering into any transaction for the transfer or sale of any of its assets outside the ordinary course of business without the written consent of FACO.

CERTIFICATION UNDER D.C.COLO.LCivR. 65(A)

Counsel for First American hereby certifies that actual notice of the filing of this Motion, and copies of all pleadings and papers filed in the action to date, have been furnished through the Court's Electronic Case Filing procedures to counsel of record for Mercury. In addition, First American advised both Mercury and Fidelity yesterday in writing of First American's intent to file this Motion today. Finally, undersigned counsel spoke earlier today with counsel of record for Mercury and advised such counsel of the timing for the filing of these Motion papers.

Respectfully submitted this 6th day of August, 2008.

ROTHGERBER JOHNSON & LYONS LLP

/s/Frederick J. Baumann
Frederick J. Baumann
One Tabor Center, Suite 3000
1200 17th Street
Denver, Colorado 80202-5839
Telephone: (303) 623-9000
Facsimile: (303) 623-9222
fbaumann@rothgerber.com

Stephen G. Blitch
Marshall C. Wallace
REED SMITH LLP
1999 Harrison Street, Suite 2400
Oakland, CA  94612-3572
Telephone:  (510) 763-2000
Facsimile:  (510) 273-8832
sblitch@reedsmith.com
mwallace@reedsmith.com

Attorneys for Counterclaimants The First American Corporation and First American Title Insurance Company

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 6, 2008, I electronically filed the foregoing **THE FIRST AMERICAN CORPORATION'S AND FIRST AMERICAN TITLE INSURANCE COMPANY'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION ENJOINING SALE OF COLORADO OPERATIONS OF MERCURY COMPANIES, INC. AND CERTIFICATION UNDER D.C.COLO.LCivR 65.1(A)** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

Lisa Hogan, Esq.
Jeanine M. Anderson, Esq.
Christopher C. Zenisck, Esq.
Brownstein Hyatt Farber Schreck, LLP
410 17th Street, #2200
Denver, CO 80202
lhogan@bhfs.com

                                            *s/ Frederick J. Baumann*
                                            Frederick J. Baumann
                                            Joy Allen Woller
                                            ROTHGERBER JOHNSON & LYONS LLP
                                            1200 17th Street, Suite 3000
                                            Denver, Colorado 80202
                                            Telephone: (303) 623-9000
                                            Facsimile: (303) 623-9222
                                            E-mail: jwoller@rothgerber.com

                                            *Attorneys for Defendants The First American Corporation and First American Title Insurance Company*