**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 08-cv-00911-WYD-CBS

MERCURY COMPANIES, INC., AMERICAN HERITAGE TITLE AGENCY, INC., D/B/A
FIRST AMERICAN HERITAGE TITLE COMPANY OF DENVER, SECURITY TITLE
GUARANTY CO., TITLE AMERICAN, INC., AND UNITED TITLE COMPANY, INC.,

      Plaintiffs,

v.

THE FIRST AMERICAN CORPORATION and FIRST AMERICAN TITLE INSURANCE
COMPANY,

      Defendants.

---

THE FIRST AMERICAN CORPORATION and FIRST AMERICAN TITLE INSURANCE
COMPANY,

      Counterclaimants,

      v.

MERCURY COMPANIES, INC., AMERICAN HERITAGE TITLE AGENCY, INC. D/B/A
FIRST AMERICAN HERITAGE TITLE COMPANY OF DENVER ALSO D/B/A FIRST
AMERICAN TITLE COMPANY OF DENVER ALSO D/B/A FIRST AMERICAN
HERITAGE TITLE COMPANY, INC., SECURITY TITLE GUARANTY CO., TITLE
AMERICA, INC., UNITED TITLE COMPANY, INC., and FIDELITY NATIONAL
FINANCIAL, INC.

      Counterdefendants.

---

**THE FIRST AMERICAN CORPORATION AND**
**FIRST AMERICAN TITLE INSURANCE COMPANY'S**
**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

---

{00605821 / 1}

# TABLE OF CONTENTS

Page

I.      INTRODUCTION AND SUMMARY OF OPPOSITION ...............................................1

II.     FACTS .....................................................................................................................3

    A.      The Distinction Between Agency and Direct Operations in the Title
    Business..............................................................................................................3

    B.      The 2000 Agreement Between First American and Mercury. ...............................4

    C.      First American Rejected Mercury's Specific Request for Restrictions on
    First American's Direct Operations in Colorado. ...................................................6

    D.      Mercury's Repudiation of its Relationship and Agreements with First
    American. ............................................................................................................6

    E.      To Preserve its Business and Mitigate its Injury, First American Opens
    Colorado Direct Operations. ................................................................................8

III.    ARGUMENT ............................................................................................................9

    A.      Plaintiffs Have A High Burden on this Motion, Particularly Because they
    Seek Mandatory Injunctive Relief. ......................................................................9

    B.      Plaintiffs Do Not—and Cannot—Demonstrate Irreparable Harm. ......................11

        1.      The Colorado Subsidiaries Allegations of Lost Revenue and Lost
        Transactions Are Claims Readily Reducible to Damages, So They
        Have a Fully Adequate Legal Remedy..............................................................12

        2.      Loss of Revenue Resulting in Potential Layoffs Is Not Irreparable
        Harm. ..............................................................................................................13

        3.      Potential Loss of Employees and Customers Is Not Irreparable
        Harm. ..............................................................................................................15

        4.      Potential Loss of Employees, Customers, and Market Share Is Not
        Irreparable Injury, Even if Described as Harm to Goodwill. ...................16

    C.      The Colorado Subsidiaries Have No Prospect of Success on the Merits of
    Their Claims. ......................................................................................................18

        1.      Mercury's and Plaintiffs' Breaches of Their Relationship and
        Agreements with First American Preclude Enforcement of the
        Colorado Exclusivity Clauses. ................................................................18

        2.      The "Exclusive Agent" Language Does Not Restrict First
        American from Pursuing *Direct Operations* in Colorado. .......................21

i

D.     The Public Interests In Competition And Freedom Of Choice In Employment Overwhelmingly Favor Denial Of An Injunction. ...........................23

E.     The Injury to FATICO of the Injunction Would Greatly Outweigh Any Harm to the Colorado Subsidiaries of Denial. ....................................................24

III.    CONCLUSION ...........................................................................................................25

# TABLE OF AUTHORITIES

Page

## CASES

*Aspen Limousine Serv., Inc. v. Colorado Mountain Express, Inc.,*
    891 F. Supp. 1450 (D. Colo. 1995) ................................................................. 25

*Baker's Aid v. Hussmann Foodservice Co., et al.,*
    839 F.2d 13 (2d Cir. 1987) ......................................................................... 15

*Chicago Title Ins. Corp. v. Magnuson,*
    487 F.3d 985 (6th Cir. 2007) ...................................................................... 16

*Citibank, N.A. v. Citytrust,*
    756 F.2d 273 (2d Cir. 1985) ....................................................................... 18

*Curtis 1000, Inc. v. Youngblade,*
    878 F. Supp. 1224 (N.D. Iowa 1995) ........................................................... 14

*Deer Valley Resort Co., L.P. v. Christy Sports, LLC,*
    No. 2:07-CV-00904, 2007 WL 4570664, *4 (D. Utah Dec. 21, 2007) ............. 12

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
    269 F.3d 1149 (10th Cir. 2001) ............................................................. 9, 11

*Emmis Communs. Corp. v. Media Strategies,*
    2001 WL 111229, *3 (D. Colo. Jan. 23, 2001) ............................................ 17

*Kansas Hosp. Ass'n v. Whiteman,*
    835 F. Supp. 1556 (D. Kan. 1993) .............................................................. 15

*King Powder Co. v. Dillon,*
    42 Colo. 316 (1908) ............................................................................ 21, 23

*Lundgrin v. Claytor,*
    619 F.2d 61 (10th Cir. 1980) ...................................................................... 18

*MaceRich Real Estate Co. VI v. Holland Properties Co.,*
    454 F. Supp. 891 (D. Colo. 1978) .............................................................. 18

*Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co., Inc.,*
    378, F.3d 29 (1st Cir. 2004) ...................................................................... 17

*McDonald's Corp. v. Brentwood Center, Ltd.,*
    942 P.2d 1308 (Colo. App. 1997) ............................................................... 12

*McNeil-PPC, Inc. v. The Procter & Gamble Co., et al.,*
    759 F. Supp 1505 (D. Colo. 1991) ......................................................... 14, 17

*Mountain Med. Equip., Inc. v. Healthdyne, Inc.,*
    582 F. Supp. 846 (D. Colo. 1984) ......................................................... 12, 24

*Navy Gas v. Shoech,*
    05 Colo. 374 (1940) ............................................................................ 21, 23

*Nutrition 21 v. United States,*
    930 F.2d 867 (Fed. Cir. 1991) .................................................................... 17

*NxGen, LLC v. Dejonge,*
    2007 WL 2788607, *2 (D. Colo. 2007, Daniel, J.) ........................... 9, 11, 12, 13

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004) ................................................................. 9, 10
*Port City Props v. Union Pac. R.R.,*
    518 F.3d 1186 (10th Cir. 2008) ..................................................................... 11
*Rash v. J.V. Intermediate, Ltd.,*
    498 F.3d 1201 (10th Cir. 2007) ..................................................................... 20
*Reuters Ltd. v. United Press Int'l, Inc.,*
    903 F.2d 904 (2d Cir. 1990) ......................................................................... 11
*SEC v. SBM Inv. Certificates, Inc.,*
    Fed. Sec. L. Rep. (CCH) P94, 166, *35 ....................................................... 10
*Security Title Agency, Inc. v. Pope,*
    No. 1 CA-CV 07-0272, 2008 WL 2895939, *1 (Ariz. App. July 29, 2008) ........ 16
*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
    60 F.3d 27 (2d Cir. 1995) ............................................................................ 17
*U.S. Fidelity & Guar. Co. v. Budget Rent-A-Car Sys., Inc.,*
    842 2.d 208 (Colo. 1992) ............................................................................. 21
*Walter Brewing Co. v. Hoder,*
    123 Colo. 421 (Colo. 1951) .......................................................................... 23
*Williams v. Whiteman,*
    1994 U.S. App. 25798 (10th Cir. 1994) ......................................................... 15
*Zurn Constructors, Inc. v. B.F. Goodrich Co.,*
    685 F. Supp. 1172 (D. Kan. 1988) ................................................................ 14

## STATUTES

Fed. R. Civ. P 65 ........................................................................................... 18
Fed. R. Evid. 402 .......................................................................................... 11
Fed. R. Evid. 403 ..................................................................................... 11, 16
Fed. R. Evid. 404 .......................................................................................... 11
Fed. R. Evid. 404(b) ...................................................................................... 16
Fed. R. Evid. 602 .......................................................................................... 11
Fed. R. Evid. 802 .......................................................................................... 11

## OTHER AUTHORITIES

RESTATEMENT (SECOND) AGENCY § 449, *comment* (b) ........................................ 21
RESTATEMENT (THIRD) AGENCY § 8.13, *comment* (b) ....................................... 21

## I.    INTRODUCTION AND SUMMARY OF OPPOSITION

Two months ago, First American[1] sought a TRO to halt Mercury Companies, Inc.

("Mercury") from selling certain subsidiaries in Colorado[2] that had agency agreements with First

American to First American's competitor, Fidelity.[3]  That transaction violated an agreement, in

which Mercury promised not to sell significant assets without First American's approval.

Although there was no question the sale violated the agreement, Judge John L. Kane declined to

enjoin the transaction because employment opportunities for individuals, and the availability of

damage remedies, trumped First American's contract rights.

Once First American's primary rival took over its Colorado agents, those agents had

immediate conflicts of interest.  First American, therefore, opened up direct Colorado operations,

giving title insurance customers a robust new option, and Colorado title employees attractive

new job opportunities.  Now the shoe is on the other foot.  Fidelity does not want First American

competing against its newly acquired Colorado Subsidiaries, so it has directed the subsidiaries to

file this Motion, asking the Court to undo First American's new Colorado enterprise and force

First American to send all its business to them.  The Colorado Subsidiaries base their Motion on

a newly invented argument that certain "exclusive agent" language was intended by the parties to

---

[1] Defendant The First American Corporation ("FACO") is the parent of Defendant First American Title Insurance Company ("FATICO"), which is one of the largest title insurance companies/underwriters in the world. FACO and FATICO are referred to collectively as "First American."

[2] The moving parties, American Heritage Title Agency, Inc., d/b/a First American Heritage Title Guaranty Co., Security Title Guaranty Co., and Title America, Inc., which were owned by Mercury, and are now owned by Fidelity, are referred to collectively as the "Colorado Subsidiaries" or "Plaintiffs."

[3] Fidelity National Financial, Inc., and its title insurance subsidiaries (collectively "Fidelity"), are underwriters, and are among First American's biggest and most significant competitors.  (Kennedy Aff. ¶ 8.)

preclude any competition in Colorado.  The Court should not hesitate to deny the Motion, for multiple reasons, including:

- The Colorado Subsidiaries seek to use as a sword **the same 2000 Agreement ruptured by Mercury and Fidelity** when Mercury sold the subsidiaries to Fidelity.  The "exclusive agent" language on which the Colorado Subsidiaries base this Motion was part of an integrated Mercury-First American deal that Mercury has completely repudiated.  The Colorado Subsidiaries cannot obtain extraordinary relief by selectively enforcing a fragment of a larger agreement, when that agreement has been thoroughly disavowed.

- Everyone in the title industry—including Mercury, the author of the "exclusive agent" language—recognizes the sharp distinction between an underwriter's **direct operation** and its **agents**.  First American's new Colorado **direct operation** does not involve any agent, so the "exclusive agent" language on which this Motion relies does not restrict that operation.

- The Colorado Subsidiaries do not begin to meet their burden of proving they will suffer "certain" irreparable injury if First American is allowed to compete in Colorado pending trial.  At most, they complain they will lose revenue from First American referrals, some of their employees might leave for better opportunities at First American, and their reputation will be damaged because they will not make as much money.  That is healthy competition, not irreparable injury.  Any injury the Colorado Subsidiaries might allege from lost referrals and customers is readily calculable as money damages.  Experts routinely provide, and Courts routinely authorize, lost profits awards in circumstances far more complex than the commonplace lost-revenue scenario presented here.

● The public interest mandates denial of the injunction. This motion asks the Court to stop competition; denial asks the Court to promote competition. The injunction would decrease job opportunities; denial of the injunction will increase employment.

Doubtless Fidelity and its new Colorado Subsidiaries would love to proceed without First American competition, to lock up their employees, and force First American to feed them referrals from First American's customers. It would be the opposite of equity for the Court to reach that result by finding one fragment of a ruptured deal still exists, and construing that fragment more broadly than intended. That is what Fidelity and its Colorado Subsidiaries invite the Court to do here. The Court should decline that invitation and deny the Motion.

## II.     FACTS

### A.     The Distinction Between Agency and Direct Operations in the Title Business.

In Colorado, as in nearly every state in the United States, title insurance is sold via two basic business channels: (1) "direct operations" in which employees of a title insurance company handle the escrow/closing and title search, then issue the title insurance company's policy and collect the premium; and (2) "agency," in which an "agent" handles the escrow/closing and title search and, under an underwriting agreement with the title insurance company (the "underwriter"), issues the title insurance policy on the policy form of the underwriter. (Kennedy Aff. ¶ 3; Edwards Aff. ¶¶ 8-9.) The agent collects the title insurance premium and remits an agreed percentage to the underwriter. This basic distinction between direct operations and agency is well established throughout the title insurance industry, (Kennedy Aff. ¶ 2), and is acknowledged by the Colorado Subsidiaries, (Plaintiffs' Brief in Support of Motion for Preliminary Injunction ("Br.") at 4).

Until very recently, Mercury, acting through a group of operating subsidiaries, was the largest agent in the United States. For decades, due to the close business relationship between First American's Chairman Parker Kennedy and Mercury's Chairman Jerrold Hauptman, Mercury's subsidiaries, including the Colorado Subsidiaries who are the moving parties on this Motion, served as the agents of FATICO under written Underwriting Agreements. (Kennedy Aff. ¶ 4; Voss Aff. Exs. A-D.) From the beginning, the Mercury-First American relationship proceeded as one of mutual trust, where a cooperative ethic of good faith, rather than a set of rigid contracts, governed the parties' relations. (Kennedy Aff. ¶ 4.)

**B.      The 2000 Agreement Between First American and Mercury.**

In 2000, the Colorado Subsidiaries fell behind in their obligation to pay FATICO its share of title insurance premiums. (Kennedy Aff. ¶ 6.) Mercury and First American discussed whether First American would finance the deficit. *Id.* First American agreed, chiefly because it wanted to secure a more formal, long-term role as the primary underwriter of the Colorado Subsidiaries, in order to minimize risk that the Mercury would end its relationship as an agent of First American in favor of an agency with one of First American's underwriter competitors. (*Id.*)

As a result, FACO and Mercury entered an agreement in which: (1) First American accepted $5 million in Mercury Preferred Stock for the premium deficit; (2) First American made an additional $15 million in capital available to Mercury; (3) the parties amended the Underwriting Agreements to make FATICO the exclusive underwriter to the Mercury Subsidiaries for 10 years; and (4) First American had the right to approve Mercury's major corporate transactions. (Kennedy Aff. ¶ 7.) This agreement was documented on December 29,

2000 (the "2000 Agreement").  The parties agreed it was integrated.  (Wawersich Aff. Ex. A at §

10.2.)

   The 2000 Agreement provides that Mercury cannot "convey, sell, lease or otherwise

dispose of . . . all or any significant part of its property or assets without the written approval of

FACO."  (*Id*. at § 8.3.)  The parties agreed neither could assign "any of its rights, interests or

obligations under the Agreement without the written approval of the other party…."  (*Id*. at §

10.3.)  FACO and Mercury also amended the Underwriting Agreements between FATICO and

the Colorado Subsidiaries, to include a provision stating that for ten years each Colorado

Subsidiary "shall not represent any competitor of First American." (*Id*. at p. 12.)  Additionally,

**Mercury's General Counsel** Mark Ridder prepared and directed the inclusion of the following

language in Agreements of Amendment of the Colorado Underwriting Agreements:

> During the term of this Agreement, [The Colorado Subsidiaries], shall be the
> **exclusive title insurance agents** of First American and its affiliates in the State of
> Colorado . . .

(Wawersich Aff. ¶ 4; Voss Aff. Exs. A-D § 9.2(b)) (emphasis added).

   This Mercury-authored, exclusive agent language was not the subject of discussion that

the participants can recall.  Plaintiffs' affiant Mr. Hauptman does not say that he discussed the

provision with Mr. Kennedy.  Nor does Mr. Kennedy recall any focus on this aspect of the deal.

(Kennedy Aff. ¶¶ 13-14.)  Mr. Kennedy does recall, however, that there was **no** discussion of

any restriction on First American direct operations.  (*Id.*; *see also* Ferguson Aff. ¶7.)

   Despite the signing of the overarching 2000 Agreement, the interactions of the companies

continued on the same informal basis as before.  For example, at the time of the 2000

Agreement, FATICO had multiple other agents in Colorado, and Mercury knew it.  (Kennedy

Aff. ¶ 10.) Despite the "exclusive title insurance agent" language, Mercury did not protest when First American continued to underwrite those agents. *Id.* Mercury and First American also discussed, and Mercury approved, FATICO underwriting other Colorado agents that were not affiliated with Mercury, including North American, Centex, and Land Title. (*Id.* at ¶ 11, Bailey Aff. Ex. A ¶¶ 8-9.)

**C.    First American Rejected Mercury's Specific Request for Restrictions on First American's Direct Operations in Colorado.**

In 2005, in a continued effort to ensure Mercury did not align with other underwriters, First American proposed a much more expansive financing relationship with Mercury. (Kennedy Aff. ¶ 17, Ex. C.) This led Mercury and First American to discuss all aspects of their relationship, exchanging Term Sheets setting out their proposals. In that context, Mercury sent First American a term sheet that proposed expanding the Colorado exclusive agent agreement to restrict First American direct operations in Colorado: "Except for existing ABA arrangements (to be scheduled at closing), FACO will not engage in the direct placement of title insurance in the state of Colorado." (Wawersich Aff. ¶ 7, Exs. B and C.) First American rejected that proposal. (*Id.* ¶ 8, Ex. D.) Ultimately, these discussions led to a deal in which First American transferred $75 million to Mercury in exchange for Mercury Series B Preferred Stock. The agreement documenting that deal did not modify the "exclusive agent" language. (*Id.* ¶ 8.)

**D.    Mercury's Repudiation of its Relationship and Agreements with First American.**

After that $75 million investment, Mercury owed First American nearly $20 million in promissory notes and $80 million in preferred stock. Unfortunately, not long after, the real estate market began its reversal, and so did Mercury's former cooperative attitude toward First American.

Since the fall of 2007, Mercury has been in default of most of its significant obligations to First American.  (Kennedy Aff. ¶ 14; Lagerway Aff. Ex. A-D.)  Those defaults include:  (1) failing to pay amounts due on promissory notes; (2) failing to pay dividends on preferred stock; (3) refusing to convert preferred stock to common stock because that would have given First American control of Mercury; and (4) abruptly terminating subsidiary operations and leaving First American as underwriter to deal with the wreckage.  (*Id.*)

Mercury didn't stop there:  In May 2000, Mercury and the Colorado Subsidiaries filed this action against First American, alleging that First American had breached the "exclusive agent" language of the 2000 Agreement.  The Complaint alleged only that First American had sent business to other Colorado agents.  Significantly, even though FATICO's NCS Division had been engaging in direct business in Colorado, Mercury and the Colorado Subsidiaries did not attack that conduct, or otherwise suggest that the "exclusive agent" language extended to direct operations.

In August, Mercury struck the final blow to its relationship with First American.  After Mercury had shut down everything except its Colorado Subsidiaries, First American and Mercury reached a deal in principle under which First American would assume responsibility for Mercury's Subsidiaries Colorado.  (*Id.* ¶ 21.)  Unbeknownst to First American, however, Fidelity and Mercury struck a deal for Fidelity to buy the Colorado Subsidiaries.  Mercury knew a deal with Fidelity would destroy its decades-long relationship with First American and breach its agreement to obtain First American's approval, so Mercury hid the details from First American, and made no effort to seek First American's approval.

First American was stunned to learn, *via* an August 5 Fidelity press release, that Mercury had sold the Colorado Subsidiaries to Fidelity. (Kennedy Aff. ¶ 17.) Within 24 hours, First American came to this Court, seeking a TRO to stop Fidelity's purchase of the Colorado Subsidiaries, based on Mercury's agreement to obtain First American's approval of any such sale of assets, and the Colorado Subsidiaries' agreement not to represent any competitor of First American. Judge Kane denied First American's application based on the availability of money damages and the public interest in jobs for the title employees.

**E.    To Preserve its Business and Mitigate its Injury, First American Opens Colorado Direct Operations.**

Mercury's sale of the Colorado Subsidiaries to Fidelity created an untenable situation. The Colorado Subsidiaries, still FATICO agents, have a conflict of interest because it is in Fidelity's interest to maximize profits by cutting the expenses of title searching and policy writing, and foisting upon underwriter FATICO the claims that will result from such cut-rate work. (Kennedy Aff. ¶ 26; Edwards Aff. ¶ 22.) Moreover, when the Colorado Subsidiaries were part of a Mercury organization that had a company-wide, good faith relationship with First American, First American could confidently refer title and escrow transactions from its important national customers to those Colorado Subsidiaries. But now, referring those transactions to a competing underwriter's company would be competitive lunacy. Finally, the underwriter-agent relationship depends on trust. There is no trust between First American and Fidelity. (Kennedy Aff. ¶ 27.)

For these reasons, once Fidelity acquired the Colorado Subsidiaries, FATICO proceeded to launch a direct operation in Colorado. It asked one of its most experienced State Managers, Lynn Donner, to move to Denver and build a direct operation. (Donner Aff. ¶¶ 2-3.) She and

others working with her are presently negotiating for space, interviewing prospective employees, negotiating contracts with vendors, and announcing that FATICO has arrived in Colorado to stay.  (*Id*. ¶ 5.)  The positive response, particularly from people in the title business wanting to work with First American, has been immediate.  (*Id*. ¶ 6.)

## III.    ARGUMENT

### A.    Plaintiffs Have A High Burden on this Motion, Particularly Because they Seek Mandatory Injunctive Relief.

The parties agree that Plaintiffs have the burden of proving four factors in seeking a preliminary injunction:  "(1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction; and (4) the injunction would not be adverse to the public interest."  (Br. at 10-11; *NxGen, LLC v. Dejonge,* 2007 WL 2788607, *2 (D. Colo. 2007, Daniel, J.) (*citing Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001) (attached as Ex. A).)

A preliminary injunction is always an extraordinary remedy, but Plaintiffs' burden is especially great here.  As Plaintiffs' acknowledge (Br. at 11), the following types of preliminary injunctions are disfavored and require the movant to satisfy an even heavier burden:  (1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief they may recover at the conclusion of a full trial on the merits.   *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (*O Centro*).  "[A] party seeking such [a disfavored] injunction must make a strong showing with regard to the likelihood of success on the merits and with regard to the balance of harms."  *O Centro* at 976.

Here, Plaintiffs seek to change the *status quo* via a mandatory injunction. Plaintiffs ask the Court to order First American to direct to them all referrals of Colorado title work for all First American companies. Plaintiffs also want the Court to force FATICO to send them FACT policy work, even though FATICO has been doing that work directly in Colorado for years. (Doman Aff. ¶¶ 5-6, 13.) Moreover, First American is already operating in Colorado. It has moved personnel here. It is in lease negotiations. It is in discussions with prospective employees. It is negotiating major contracts. It has announced its arrival through the media and industry events, and to Colorado's insurance regulators. While the injunction sought is prohibitory in language, it is mandatory in effect.[4] *SEC v. SBM Inv. Certificates, Inc.*, Fed. Sec. L. Rep. (CCH) P94, 166, *35 (applying heightened preliminary injunction scrutiny because mandatory effect of order trumped prohibitory form). If it grants the injunction, this Court will have ongoing supervisory obligations because First American's national customers still will have title insurance needs in Colorado, and Plaintiffs are asking the Court to compel First American to funnel all that work to them and do none of it internally. *O Centro*, 389 F.3d at 979 (An injunction that does not alter the status quo is still considered mandatory if it requires "ongoing supervision to assure the nonmovant is abiding by the injunction").

The present motion thus falls squarely into the "disfavored" category of preliminary injunction. And as this Court has recognized, even for those components of the relief that are prohibitory, the Colorado Subsidiaries must meet a high standard: "Because a preliminary

---

[4] The Colorado Subsidiaries ask the Court to force First American to: (1) affirmatively inform its customers that it cannot perform their transactions in Colorado and, implicitly, transfer those transactions to them; (2) tell vendors to stop supplying goods and services; and (3) cut off discussions with employees not to come to work and stop providing services; and (4) publicize the fact that it may not continue business in Colorado.

injunction is an extraordinary remedy, the movant's right to relief must be clear and

unequivocal." *NxGen*, 2007 WL 2788607 at \*2; *Dominion Video*, 269 F.3d at 1154.[5]

## B.    Plaintiffs Do Not—and Cannot—Demonstrate Irreparable Harm.

The Tenth Circuit has instructed that "'[b]ecause a showing of probable irreparable harm

is the single most important prerequisite for the issuance of a preliminary injunction, the moving

party must first demonstrate that such injury is likely before the other requirements for the

issuance of an injunction will be considered.'" *Dominion Video Satellite*, 356 F.3d at 1260

(*quoting Reuters Ltd. v. United Press Int'l, Inc*., 903 F.2d 904, 907 (2d Cir. 1990)). The moving

party must make a compelling showing that, absent the injunction, it will suffer **certain**

irreparable injury. *Port City Props v. Union Pac. R.R.*, 518 F.3d 1186, 1190 (10th Cir. 2008);

*NxGen,* 2007 WL 2788607 at \*4 (the injury "'must be both certain and great,' and 'must not be

merely serious or substantial'").

As Plaintiffs concede, the breach of an exclusivity provision alone does not satisfy the

irreparable harm factor. *Dominion Video Satellite*, 356 F.3d at 1262. Rather, courts look beyond

the exclusivity provision, and determine whether the moving party has provided other facts

clearly demonstrating irreparable harm. *Id*. at 1263.

Plaintiffs argue they will suffer irreparable injury if First American competes in Colorado

because: (1) Plaintiffs will lose revenue and may have to fire employees; (2) they will lose key

employees and customers as a result of competition with First American; and (3) they will suffer

harm to their goodwill and business reputation. (Br. at 12-17.) These claims do not justify

---

[5] Plaintiffs' attempts to meet this strict standard are particularly futile because much of Plaintiffs' "evidence" is speculation, hearsay, and irrelevant. First American objects to such inadmissible evidence, and will provide more particularized objections should the Court desire. Fed. R. Evid. 402, Fed. R. Evid. 403, Fed. R. Evid. 404, Fed. R. Evid. 602 and Fed. R. Evid. 802.

injunctive relief because they may all be reduced to money damages, they are far from certain, and they do not rise above the "merely serious or substantial" to the level of irreparable.

1.    The Colorado Subsidiaries Allegations of Lost Revenue and Lost Transactions Are Claims Readily Reducible to Damages, So They Have a Fully Adequate Legal Remedy.

When a party has an adequate legal remedy, such as money damages, injunctive relief must be denied. *Mountain Med. Equip., Inc. v. Healthdyne, Inc.*, 582 F. Supp. 846, 849 (D. Colo. 1984) ("future losses, if they are quantifiable, do not constitute irreparable injury"); *see NxGen*, 2007 WL 2788607 at *3. Other than stating conclusions that measuring damages would be "difficult," Plaintiffs do not even address the availability of money damages.

Colorado law specifically recognizes lost profits as a damages remedy for breach of an exclusivity agreement. *McDonald's Corp. v. Brentwood Center, Ltd.*, 942 P.2d 1308, 1311 (Colo. App. 1997), is closely analogous to this case. There, McDonald's sued a shopping center for leasing space to another fast food restaurant despite the shopping center's express agreement that McDonald's would be the exclusive fast food restaurant in the center. The trial court denied a preliminary injunction, but awarded damages for lost profits. The appellate court affirmed the damage award. *Id.* at 1311 ("Because the damages award was based on historical sales revenues and investment returns…we conclude that the calculations were reasonable and could be determined by the fact finder to be a valid means for determining damages."). *See also Deer Valley Resort Co., L.P. v. Christy Sports, LLC*, No. 2:07-CV-00904, 2007 WL 4570664, *4 (D. Utah Dec. 21, 2007) (denying preliminary injunction seeking to prevent operation of competing ski rental business because damages in the form of lost profits were readily ascertainable) (attached as Ex. B).

Plaintiffs do not, and cannot, explain why their lost profits damage remedy is not fully adequate. Assuming Plaintiffs prove at trial that FATICO's Colorado operation breaches the "exclusive agent" language, Plaintiffs may, using a number of available approaches, compute their lost profits. (Lundelius Aff. ¶¶ 7-8.) FATICO's Colorado operation is keeping separate books (Donner Aff. ¶ 3) and each Colorado Subsidiary also keeps its own accounts (DE 17 at Ex. 3), so the accounting data for any calculation will be readily available. The calculation would be particularly definite in this case: If enforced, the exclusivity agreement ends in just over two years, so by the time of trial there will be little future projection needed. (Lundelius Aff. ¶ 7.0 Charles Lundelius, an expert who has testified in numerous cases concerning lost profits calculations, confirms that this is a routine case, for which a lost profits calculation will be a straightforward matter. (*Id.* ¶ 13.)

Plaintiffs have **no** contrary evidence. Indeed, Mercury and Plaintiffs themselves have acknowledged they have a damage remedy, for Mercury has announced to creditors that it has an agreement with Plaintiffs to share in the proceeds of this exclusivity challenge. (Sullivan Aff. ¶ 3.) Such a deal makes no sense unless the parties conceive of this as a damage, not injunctive, claim. Plaintiffs cannot escape the truth: this is a money damage case. The injunction must be denied on this ground alone. *NxGen,* 2007 WL 2788607 at *3.

2.     Loss of Revenue Resulting in Potential Layoffs Is Not Irreparable Harm.

Plaintiffs acknowledge that the harm they face from competition with First American's direct operations is merely "loss of revenue," but contend extraordinary relief is appropriate because the lost revenue **may** result in layoffs. (Br. at 13.) This argument goes nowhere.

This Court has established that the threat of layoffs does not constitute irreparable harm. *See McNeil-PPC, Inc. v. The Procter & Gamble Co.*, 759 F. Supp 1505, 1509 (D. Colo. 1991) (denying injunction and finding that plaintiff failed to show irreparable harm because money damages can compensate for any layoffs).  Plaintiffs' cases do not alter this rule.  *See, e.g. Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224 (N.D. Iowa 1995) (applying rule, expressly rejected by the 10th Circuit in *Dominion*, that violation of a non-compete presumptively established irreparable harm and stating in dicta the bare conclusion that layoffs may contribute to a finding of irreparable harm); *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172 (D. Kan. 1988) (holding that forcing layoffs by a small town company threatened "the very business existence" of the company, justifying finding of irreparable harm).  Plaintiffs' "lost revenues means layoffs" theory cannot justify an injunction.  If that theory were enough for injunctive relief, then business damage injunctions would become routine:  Virtually every business injury will cause loss of revenues, and every business can allege it will have to lay off employees due to such a revenue loss.

Moreover, Plaintiffs offer nothing more than conjecture regarding potential layoffs.  Two employees submit affidavits vaguely asserting that, absent an injunction, Plaintiffs may lose referrals that previously constituted 10-20% of their business, which in turn may cause them to lay off a "substantial number of employees."  The Colorado Subsidiaries already are laying off employees in accord with Fidelity's announced strategy: "Aggressively reduce headcount as order volume[s] decline; slow to add headcount when volumes improve."  (Wallace Aff., Ex. C at 11; Donner Aff. ¶ 9; Bailey Aff. ¶ 11.)  Plaintiffs' speculation that an injunction may prevent some potential layoffs cannot support a finding of irreparable harm.  *See Kansas Hosp. Ass'n v.*

*Whiteman*, 835 F. Supp. 1556, 1564 (D. Kan. 1993), *aff'd Williams v. Whiteman*, 1994 U.S. App.

25798 (10th Cir. 1994); *Baker's Aid v. Hussmann Foodservice Co., et al.*, 839 F.2d 13 (2d Cir.

1987) (speculation insufficient to establish irreparable injury).

      3.     <u>Potential Loss of Employees and Customers Is Not Irreparable Harm.</u>

      Plaintiffs next posit that they may suffer irreparable harm if their Colorado employees

find employment with First American to be an attractive alternative.  (Br. at 13-16.)  That is

normal competition benefiting Colorado citizens, not irreparable injury.  Plaintiffs fail to cite any

authority supporting the proposition that loss of employees resulting from fair competition is a

type of harm courts should prevent through the extraordinary relief of a preliminary injunction.

Moreover, the profits, if any, associated with any loss of customer transactions due to an

employee choosing to work with FATICO would be calculable.  (Lundelius Aff. ¶10.)

      The Colorado Subsidiaries therefore ask the Court to engage in even wilder speculation,

claiming that FATICO will illegally recruit their employees.  Plaintiffs have no evidence to

support such conjecture.  At most, Plaintiffs' Affidavits show that: (1) FATICO is interviewing

some of their employees, and (2) FATICO has not had further discussions with anyone having a

non-compete agreement.  (Donner Aff. ¶ 8; Br. at Vincent Aff. ¶ 14; *id.* at Ellis Aff. ¶¶ 3-5; *id.* at

Jewkes Aff. ¶ 9; *id.* at Longo Aff. ¶ 25.)  That is completely lawful, and indeed, desirable

competition in the employment market.  Moreover, in most cases the Colorado Subsidiaries'

employees **initiated the contact** with FATICO, because they are eager to come to work at

FATICO's Colorado operation.  (*See* Donner Aff. ¶ 6; Ives Aff. ¶¶ 2, 5; Notarianni Aff. ¶¶ 5-9. )

      Because the actual facts disprove their illegal recruiting hypothesis, Plaintiffs ask this

Court to assume First American will engage in illegal conduct because of what happened long

ago in two other entirely distinct situations.  In *Chicago Title Ins. Co.  v. Magnuson* and *Security Title Agency v. Pope*, Fidelity companies obtained jury verdicts against FATICO for inducing breach of a non-compete agreement and aiding and abetting a breach of fiduciary duty.  Those cases involved entirely different circumstances, actors, and facts than those relevant here.  Evidence of those matters does not get past Fed. R. Evid. 404(b) or Fed. R. Evid. 403, let alone meet the high standard of proof required on this motion.[6]

In fact, the *Magnuson* and *Pope* cases underscore why the Court should *deny* the injunction.  In both cases, Fidelity sought and obtained **money damages** as a result of customers who left with employees recruited by First American companies.  *Security Title Agency, Inc. v. Pope*, No. 1 CA-CV 07-0272, 2008 WL 2895939, *1 (Ariz. App. July 29, 2008) (attached as Ex. C); *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 990 (6th Cir. 2007).  These cases demonstrate that Fidelity knows how to reduce an employee movement claim to damages.

4.    Potential Loss of Employees, Customers, and Market Share Is Not Irreparable Injury, Even if Described as Harm to Goodwill.

Finally, Plaintiffs repackage the same potential injuries (loss of employees, customers, and market share) as harm to their "goodwill" in an attempt to make this case look more like

---

[6] In fact, as Plaintiffs' own evidence acknowledges, the title industry has been characterized by high employee mobility.  (Br. at Vincent Aff. ¶¶ 9-10; Jewkes Aff. ¶ 7.)  No one knows this better than Mercury, the Colorado Subsidiaries, and their affiliates.  Other title companies sued Mercury companies, including the Colorado Subsidiaries, in multiple "employee raiding" cases; and those companies brought their own cases on similar grounds. *See Fidelity National Title Insurance Co. v. Financial Title Co., et al.*, Superior Court of the State of California for the County of Santa Clara, Case No. 1-05-CV-054608; *Ticor Title Co.y of California, et al. v. Mercury Cos., Inc. et al.*, Superior Court of the State of California for the County of Los Angeles, Case No. BC 329992; *Mercury Cos., Inc., et al. v. Fidelity National Financial, Inc., et al.*, Arizona Superior Court for Maricopa County, Case No. CV2007-004229.  Most pertinent, in 2005 Fidelity's Ticor Title Company subsidiary sued Mercury for hiring away 70 employees, and Mercury companies sued Ticor for hiring back about 40 others.  Employers in the title business, including the parties to this case, recruit from each other all the time.

ones in which courts have granted injunctive relief.  (Br. at 16-17.)  Labeling money losses "goodwill" does not transform them into irreparable injury.

As described above, every component of Plaintiffs' alleged "goodwill" may be reduced to money damages, and virtually none is certain. First, the inability to recruit key employees does not constitute irreparable harm.  *See McNeil-PPC, Inc.*, 759 F. Supp. at 1509 (holding that legal remedies are sufficient to compensate for "inability to attract qualified people").  Second, loss of market share does not support a showing of irreparable harm.  *Emmis Communs. Corp. v. Media Strategies*, 2001 WL 111229, *3 (D. Colo. Jan. 23, 2001) (denying preliminary injunction because loss of market share can be corrected through the award of money damages) (attached as Ex. D); *Nutrition 21 v. United States*, 930 F.2d 867, 871 (Fed. Cir. 1991) ("[N]either the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial").  Third, Plaintiffs' unsupported assertion that their "goodwill" will be harmed does not show of irreparable injury.  *Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co., Inc.*, 378, F.3d 29, 34 (1st Cir. 2004) (potential lost goodwill arising out of violation of non-compete clause is "too speculative" to warrant a preliminary injunction).  Here again, if Plaintiffs' bare "goodwill" claim is enough, any lawyer can turn any business damage claim into an injunction, simply by claiming lost "goodwill."[7]

Plaintiffs rely upon *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995).  There, plaintiff had made a "clear showing" that potential loss of goodwill could constitute irreparable harm since the product sought was so **uniquely** popular that it would

---

[7] Moreover, because the "goodwill" alleged by Plaintiffs derives from Plaintiffs' claims of lost business, it is entirely redundant, and would result in a double recovery if allowed.  (Lundelius Aff. ¶ 13.)

radically alter plaintiff's position in the industry.  Here, the only evidence is that title insurance is **not** unique.  (Edwards Aff. ¶ 16.)

Plaintiff American Heritage also argues that the direct operation will cause it harm because it operates under a name similar to that of FATICO.  Br. at 17.  This argument goes nowhere.  American Heritage does not have the right to stop its licensor from using the licensor's own name.  It agreed with FATICO that:

> [American Heritage] shall not use any name, designation, emblem or logo of
> FIRST AMERICAN or its parent or affiliates, in any way, except with the express
> written consent of FIRST AMERICAN . . .

(Voss Aff. Ex. A, Part 2 at 12).  This contract disposes of American Heritage's claims of confusion and injury.[8]

## C.    The Colorado Subsidiaries Have No Prospect of Success on the Merits of Their Claims.

Logically, there can be no injunction where there is no claim.  Fed. R. Civ. P 65; *MaceRich Real Estate Co. VI v. Holland Properties Co.*, 454 F. Supp. 891, 898 (D. Colo. 1978) (preliminary injunction denied where plaintiff failed to show "clear and unequivocal" probability of success on contract claim); *Lundgrin v. Claytor*, 619 F.2d 61, 64 (10th Cir. 1980).  The Colorado Subsidiaries' have no valid claim for multiple independent reasons.

1.    <u>Mercury's and Plaintiffs' Breaches of Their Relationship and Agreements with First American Preclude Enforcement of the Colorado Exclusivity Clauses.</u>

Plaintiffs pretend the Agreements of Amendment containing the "exclusive agent" language exist in a vacuum.  Plaintiffs mention the 2000 Agreement, of which the Agreements of

---

[8] Moreover, identical, not merely similar, names are necessary for any injunctive relief. *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  Here, as in *Citibank*, "[s]uch factors are either not present … or are not sufficiently established on the record to support a finding of irreparable harm." *Id.*  And here again, any possible harm from this issue can be reduced to money damages.  (Lundelius Aff. ¶ 12.)

Amendment were an integral part, only in a passing footnote in their brief. (Br. at 7, n. 7.) Plaintiffs' avoidance of the 2000 Agreement betrays their recognition that, when one considers the actual Mercury-First American relationship and the larger agreement in which the "exclusive agent" language arose, their case on the merits has no chance.

The exclusivity language upon which this motion is based was part of the integrated, multi-party 2000 Agreement. (Kennedy Aff. ¶ 11; Exh. A to Wawersich Aff. at § 10.2) (2000 Agreement includes documents referenced in Agreement).) That transaction was part of an even broader Mercury-First American relationship. (Kennedy Aff. ¶ 12.) For decades, Mercury's and First American's top executives guided the companies through a relationship of mutual confidence and trust. (*Id.* ¶ 4.) First American's main reason for that relationship, and the 2000 Agreement, was keeping Mercury away from other underwriters. (*Id.* ¶ 24.)

Mercury has now repudiated the 2000 Agreement and the relationship in virtually every possible way. Nearly a year ago, Mercury defaulted on its notes and stopped paying dividends on Preferred Stock. (Lagerwey Aff. ¶¶ 3-6 and Ex. A.) Mercury abruptly shuttered all of its agency subsidiaries outside Colorado, leaving FATICO as the underwriter responsible for dealing with the refuse. Mercury repudiated a FATICO stock conversion that would have put FATICO in control of Mercury. Mercury declared bankruptcy, likely nullifying First American's $100 million investment. And, of course, Mercury violated its promise not to sell its assets or assign any of its rights "without the written approval of FACO" when it sold the Colorado Subsidiaries to Fidelity.

Fidelity's ownership of the Colorado Subsidiaries is completely inconsistent with the entire basis for the 2000 Agreement, which was predicated on trust and mutual cooperation. It is

also unworkable.  The Subsidiaries have a conflict of interest because they serve as FATICO's

agents but owe Fidelity a duty to maximize profits.  (Edwards Aff. ¶ 22; Kennedy Aff. ¶¶ 25-27.)

They have every incentive to take national clients away from FATICO.  (Kennedy Aff. ¶ 25;

Edwards Aff. ¶ 22.)  And bedrock trust is necessary to the agent-underwriter relationship.  That

trust evaporated when Fidelity bought the subsidiaries.  (Kennedy Aff. ¶ 27.)

For these reasons, Plaintiffs themselves also necessarily have breached their

Underwriting Agreements.  *Rash v. J.V. Intermediate, Ltd.*, 498 F.3d 1201, 1210 (10th Cir. 2007)

("[A]n agent has a duty to refrain from…taking action on behalf of or otherwise assisting the

principal's competitors.").  Now that Plaintiffs are owned and controlled by Fidelity, they are

violating that duty as well as their express promise that they "shall not represent any competitor

of First American . . . in providing services."  (Voss Aff. Exs. A-D, § 9.2(a).)  While the

Colorado Subsidiaries may be selling a FATICO insurance policy, they are rendering their

services, soliciting customers, handling escrows, writing policies, dealing with claims—and

acting in this litigation—in the interests of their owner, Fidelity.  Moreover, the Underwriting

Agreements all contain agreements forbidding assignment.  (Pls. Ex. 1-3 at § 13.5.)  The sale to

Fidelity breaches the letter and spirit of all these duties and agreements.

Mr. Kennedy put it simply and eloquently:

> I cannot imagine a more fundamental and total breach of the relationship that First
> American had with Mercury, and the agreement that Mr. Hauptman and I entered
> into on behalf of our companies in late 2000 and early 2001, than the recent sale
> by Mercury of the Colorado Subsidiaries to Fidelity.

(Kennedy Aff. ¶ 24.)  Mercury and Mr. Hauptman tore the heart out of that relationship when

they went behind First American's back to sell to its rival.  Fidelity's present attempt to

selectively enforce a fragment of a deal that was intended, in large part, to keep Fidelity **away**

from Mercury's subsidiaries, is absurd.  Plaintiffs have no likelihood of enforcing on a contract

that they and their co-party have disavowed.

> 2.    The "Exclusive **Agent**" Language Does Not Restrict First American from Pursuing *Direct Operations* in Colorado.

Even if it were still enforceable, and it is not, the language on which the motion relies

does not prohibit the conduct in which FATICO is engaged.  The law is in accord:

> **Unless otherwise agreed, a principal is not subject to a general duty to refrain from competition with the agent** that does not interfere with the agent's ability to achieve standards set by contract, which would be the counterpart to an agent's duty to refrain from competition with the principal as stated in §8.04.

RESTATEMENT (THIRD) AGENCY § 8.13, *comment* (b) (emphasis added).

In determining whether a principal has agreed to refrain from direct competition with the

agent or, instead, merely promised that it would not engage other agents to compete, courts

examine: (1) the plain language of the agreement; (2) "the customs of the business or profession"

at issue; and (3) negotiations surrounding the agreement.  *See Navy Gas v. Shoech*, 105 Colo.

374, 378 (1940); RESTATEMENT (SECOND) AGENCY § 449, *comment* (b); *King Powder Co. v.

Dillon*, 42 Colo. 316, 325 (1908).  All of these considerations defeat Plaintiffs' expansive

interpretation of the "exclusive agent" provision.

The plain language, of course, is that Plaintiffs "shall be the exclusive title insurance

agents" in the State of Colorado.  First American is commencing a **direct operation**.  The

governing language simply does not prohibit FATICO's conduct.  This is particularly true

because Plaintiffs' lawyer prepared the language and thus any ambiguity in the language must be

construed against the drafter.  *U.S. Fidelity & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 2.d

208, 211 (Colo. 1992) (*en banc*).

Second, this language must be read in accord with industry custom.  Plaintiffs acknowledge the agent/direct operations dichotomy.  (Br. at 4.)  Mr. Hauptman also readily acknowledges the distinction.

> Q:  Generally speaking, the major title insurance companies have direct operations and agency operations, right?
>
> A [Mr. Hauptman]:  Yes.
>
> Q:  And those national insurance companies, their direct operations are also direct competitors of their agency operations, right?
>
> A:  Often times.

(Hauptman Depo., Wallace Aff., Ex. A at 25: 6-13.)  Neither Mr. Hauptman nor anyone else in the title business would have used only the words "exclusive agent" if in fact he or she intended to preclude an underwriter from pursuing direct operations:

> The distinction between "agent" and "direct operation" is too fundamental and too well understood in the title business in Colorado, and nationally, for that matter, for that language to be reasonably intended, interpreted or concluded to include direct operations.  A title insurance agent seeking to preclude its underwriter from competing directly in the territory would, in the ordinary course of the title insurance business in Colorado, specifically refer to direct operations in the exclusivity portion of the underwriting agreement.  . . .  My opinion . . . is that the express language of sections 9.1 and 9.2(b), quoted above, limits the underwriter from authorizing other title insurance agents to issue its title insurance products in the specified state, and it does not prohibit the underwriter from entering the state with direct operations.

(Edwards Aff. ¶ 13.)

Mercury's negotiations also prove it did not believe the Agreements of Amendment prevented First American direct operations.  In 2006, Mercury asked FATICO to expand the exclusivity clause to read, "FACO will not engage in the direct placement of title insurance in the state of Colorado."  Mercury would not have asked for this amendment if it believed the "exclusive agent" language prevented direct operations.

Plaintiffs' authorities require no different outcome.  Both cases upon which the Colorado Subsidiaries rely hold that the "intention of the parties" governs.  *Walter Brewing Co. v. Hoder*, 123 Colo. 421, 424 (Colo. 1951); *Navy Gas*, 98 P.2d 860.  Here, like *King Powder* and in contrast to *Navy Gas*, FATICO specifically rejected Mercury's invitation to expand the agreement to prohibit direct operations.  Moreover, rules regulating regional beer and petroleum distribution in the 1930s and 40s simply cannot be extended to control underwriter-agent relationships in the 21st Century.  The agent-underwriter relation involves personal services, trust, fiduciary duties, and most important, a clear agency-direct operation distinction; delivering beer and gas by truck is not comparable.

Plaintiffs also point out that FATICO directed certain Colorado business to them.  They fail to mention that FATICO also continued to perform substantial Colorado business directly.  (Ghilardi Aff., ¶¶ 6-7, Doman Aff. ¶¶ 5-6, 13.)  Plaintiffs speculate, moreover, that First American directed business to them because of the "exclusive agent" provision.  The only evidence is that First American referred Colorado matters to the Mercury subsidiaries because of the long-standing cooperative relationship between Mercury and First American at the highest levels of the companies.  (Kennedy Aff. ¶ 4.)  The truth is that Fidelity, in its bid to keep First American from competing, has concocted a construction of the "exclusive agent" language that none of the actual parties to the language ever contemplated, that is at odds with industry custom, and that Fidelity's predecessor could not obtain by negotiation.  That cannot be the basis for extraordinary relief.

**D.     The Public Interests In Competition And Freedom Of Choice In Employment Overwhelmingly Favor Denial Of An Injunction.**

Because an injunction would reduce competition in the Colorado title insurance and closing market, the public interest overwhelmingly favors denial of the injunction.  *Mountain Med. Equip., Inc. v. Healthdyne, Inc.,* 582 F. Supp. 846, 850 (D. Colo. 1984) (preliminary injunction denied; public policy favoring business competition would be contravened by injunction prohibiting business from contacting customers).

The public interest in employment opportunity also requires denial of Plaintiffs' motion.  A month ago, Judge Kane found that perhaps the most important factor in denying First American injunctive relief was the public interest as represented by the employment rights of the employees of the Colorado Subsidiaries.  (*See* Wallace Aff., Ex. B at 36.)  That rationale applies even more powerfully here.  Fidelity already is laying off people and shutting down offices.  (Donner Aff. ¶ 9; Bailey Aff. ¶ 11; McIntosh Aff. ¶¶ 2-3.) First American, by contrast, is hiring.  Not surprisingly, many employees of the Colorado Subsidiaries have expressed great interest in working for FATICO.  (Donner Aff. ¶ 6, Bailey Aff. ¶ 11.)  Rather than working for the Fidelity Companies that will be "reducing headcounts" in their seven Colorado brands, these employees now have the opportunity to work *directly* for a growing enterprise.  The public interest is far better served by denial of the injunction, which will promote stable job opportunities in these uncertain times, than granting Plaintiffs' request to shut the doors to those opportunities.

**E.     The Injury to FATICO of the Injunction Would Greatly Outweigh Any Harm to the Colorado Subsidiaries of Denial.**

The foregoing discussion leaves no doubt:  Balancing the hardships overwhelmingly favors denial of the injunction.  If the injunction issues, First American will be forced to direct its national customers' title orders for Colorado property either to Fidelity-owned companies or to agents of other competing underwriters.  Either way, the Court will be forcing First American to

put its most valuable relationships in the clutches of its competitors.  Moreover, First American

will have to undo the Colorado enterprise FATICO has established.  Having lost its momentum,

it will be difficult to FATICO to re-start that effort with similar vigor, because prospective

customers, business vendors and employees will question whether there will be another false

start.  Those FATICO would have hired will be deprived of an attractive job prospect.  There

will be no way to measure what business First American would have garnered had it not been

enjoined.  In short, granting the motion will cause First American, and the employees it

otherwise would hire in Colorado, irreparable injury.  *See Aspen Limousine Serv., Inc. v.

Colorado Mountain Express, Inc.*, 891 F. Supp. 1450, 1458 (D. Colo. 1995) (preliminary

injunction denied where grant of injunction would require shutdown of majority of defendant's

business).

By contrast, the Colorado Subsidiaries will suffer no irreparable injury from denial of the

injunction, as discussed above.  They will be able to compete for business and employees

precisely as is presently the case if the injunction is denied.  The equities demand denial of the

injunction sought on this motion.

### III.    CONCLUSION

The Court should have no illusion about why Fidelity is seeking this injunction.  Having

helped destroy a First American-Mercury deal that was predicated on a mutual, cooperative

relationship, Fidelity is now trying to use a remnant of that destroyed deal to force First

American to direct all of its Colorado business to Fidelity.  The Court should reject Fidelity's

misuse of the legal system, and deny the injunction.

Dated:  October 7, 2008.

/s/ Joy Allen Woller
Frederick J. Baumann
Kenneth F. Rossman IV
Joy Allen Woller
ROTHGERBER JOHNSON & LYONS LLP
One Tabor Center, Suite 3000
1200 17th Street
Denver, Colorado  80202
Telephone: (303) 623-9000
Facsimile:  (303) 623-9222
fbaumann@rothgerber.com
krossman@rothgerber.com
jwoller@rothgerber.com

Stephen G. Blitch
Marshall C. Wallace
REED SMITH LLP
1999 Harrison Street, Suite 2400
Oakland, CA  94612-3572
Telephone:  (510) 763-2000
Facsimile:  (510) 273-8832
sblitch@reedsmith.com
mwallace@reedsmith.com
*Attorneys for Defendants/ Counterclaimants*
*The First American Corporation and First*
*American Title Insurance Company*

CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of October 2008, true and correct copies of the foregoing THE FIRST AMERICAN CORPORATION AND FIRST AMERICAN TITLE INSURANCE COMPANY'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION were electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Lisa Hogan, Esq.
Michael J. Pankow, Esq.
Jeanine M. Anderson, Esq.
Brownstein Hyatt Farber Schreck, LLP
410 17th Street, #2200
Denver, CO 80202
lhogan@bhfs.com
mpankow@bhfs.co
janderson@bhfs.com

Donald E. Scott, Esq.
John McCaskill Hughes, Esq.
Sean C. Grimsley, Esq.
Sundeep Kumar Addy, Esq.
Bartlit, Beck, Herman, Palenchar & Scott, LLP
1899 Wynkoop Street, 8th Floor
Denver, CO 80202
don.scott@bartlit-beck.com
john.hughes@bartlit-beck.com
sean.grimsley@bartlit-beck.com
rob.addy@bartlit-beck.com

/s/ Joy Allen Woller
Frederick J. Baumann
Joy Allen Woller
ROTHGERBER JOHNSON & LYONS LLP
One Tabor Center, Suite 3000
1200 17th Street
Denver, Colorado  80202
Telephone: (303) 623-9000
Facsimile:  (303) 623-9222
fbaumann@rothgerber.com
jwoller@rothgerber.com