IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  08-cv-00911-WYD-CBS

MERCURY COMPANIES, INC.;
AMERICAN HERITAGE TITLE AGENCY, INC., d/b/a FIRST AMERICAN HERITAGE
TITLE COMPANY OF DENVER;
SECURITY TITLE GUARANTY CO.;
TITLE AMERICA, INC.; and
UNITED TITLE COMPANY, INC.,

      Plaintiffs and Counterclaim Defendants,

v.

THE FIRST AMERICAN CORPORATION; and
FIRST AMERICAN TITLE INSURANCE COMPANY,

      Defendants and Counterclaimants.

---

**ORDER**

---

I.    <u>INTRODUCTION</u>

      This matter comes before the Court on the Motion for Preliminary Injunction filed

by American Heritage Title Agency, Inc. d/b/a First American Heritage Title Company of

Denver ("American Heritage"), Security Title Guaranty Co. ("Security Title"), and Title

America, Inc. ("Title America") (collectively "Plaintiffs" or "the Colorado subsidiaries" for

purposes of the Motion).  Plaintiffs Mercury Companies, Inc. ("Mercury") and United

Title Company, Inc. ("United Title") are not parties to the Motion for Preliminary

Injunction.  An evidentiary hearing was held on the motion on October 14, 2008.

      Plaintiffs request that the Court issue a preliminary injunction prohibiting

Defendants The First American Corporation ("FACO") and First American Title

Insurance Company ("FATICO") (collectively "First American") from directly selling or offering to sell title insurance policies in Colorado, an alleged violation of Defendants' exclusivity agreements with Plaintiffs. Plaintiffs further request that any preliminary injunction order prohibit Defendants from soliciting Plaintiffs' Colorado employees and/or customers.

II.   FACTUAL BACKGROUND

In Colorado title insurance is sold via two basic business channels: (1) "direct operations" in which employees of a title insurance company handle the escrow/closing and title search, then issue the title insurance company's policy and collect the premium; and (2) "agency," in which an "agent" handles the escrow/closing and title search and, under an underwriting agreement with the title insurance company (the "underwriter"), issues the title insurance policy on the policy form of the underwriter. The agent collects the premium and remits an agreed percentage to the underwriter.

FACO, through its operating subsidiary, FATICO, underwrites title insurance policies in the State of Colorado. Plaintiffs American Heritage, Security Title and Title America are title insurance agents. For decades (since 1977), Plaintiffs assert that First American has employed Plaintiffs as their exclusive insurance agents in Colorado with the exclusive right to sell FATICO's title insurance policies within Colorado.

The contractual obligations are set forth in underwriting agreements between Defendants and each of the individual Plaintiffs. On or about January 8, 2001, Defendants entered into a series of written amendments ("Agreements of Amendment") to their respective underwriting agreements with Plaintiffs. Copies are attached as

Exhibits A - C to Plaintiff's Motion for Preliminary Injunction. The agreements are governed by Colorado law. Under Section 9.2(b) of the Agreements of Amendment, Defendants provided Plaintiffs an exclusive right to sell First American title insurance policies in the state of Colorado. (Ex. A at A-2.) The exclusivity provision, which extended the term of the 1998 Underwriting Agreements through January 8, 2011, reads in pertinent part:

> 9.2 Exclusivity.
>
> (b) During the term of this Agreement, Heritage, Security Title Guaranty Co., a Colorado corporation, and Title America, Inc., a Colorado corporation, ***shall be the exclusive title insurance agents*** of First American and its affiliates in the State of Colorado. . . .

Ex. 4 p. A2 (emphasis added). Under Colorado law, Plaintiffs contend that the above provision precludes FACO and its affiliates from selling First American title insurance policies directly in the state of Colorado.

Plaintiffs note that by 2001, when the parties signed the Agreements of Amendment, Security Title and American Heritage were collectively the largest title insurance agencies in Colorado. Because of its relationship with those agencies, FACO currently underwrites more policies in Colorado than any other underwriter. Plaintiffs assert that the agreement was a boon to First American. Although First American received only a fraction of the premiums on policies sold by Plaintiffs, it is argued that the arrangement nevertheless provided First American with substantial economic benefit: First American suddenly had access to a much larger geographic portion of Colorado, as well as an established group of sales people and

escrow agents, without having to invest in the infrastructure that expansion of its direct operations in Colorado would have required.

On May 1, 2008, Plaintiffs, along with Mercury and United Title, commenced this action against FACO and FATICO. The Second Amended Complaint sues for a declaratory judgment, a permanent and preliminary injunction, and for breach of contract. Fidelity and its affiliates originally had no involvement with this lawsuit, either with Mercury or with Plaintiffs. Rather, after suit commenced, FACO engaged in protracted negotiations with Mercury to buy Plaintiffs. Plaintiffs allege that FACO offered little value to Mercury, and that FACO told Mercury that it had "no choices" but to sell the Colorado subsidiaries to it. Facing an August 6th payroll, Mercury negotiated the sale of its subsidiaries to Fidelity, closing the transaction on August 5, 2008, through a 100% common stock transfer. Fidelity helped Mercury meet its payroll and stabilize its condition.

On August 6, 2008, First American filed a motion for temporary restraining order to undo Fidelity's acquisition. The hearing on that motion before Judge Kane of this Court focused in part on First American's allegation that Mercury was contractually bound not to sell its subsidiaries (or other assets) to anyone except First American. Specifically, First American asserts that the acquisition by Fidelity of the Colorado subsidiaries violated an agreement in which Mercury promised not to sell significant assets without First American's approval. Once rival Fidelity took over First American's Colorado agents, First American alleges that those agents had immediate conflicts of interest. The motion for temporary restraining order was denied by Judge Kane.

Since then, Plaintiffs have continued to sell only First American title insurance policies subject to the exception in the Agreements of Amendment and has remitted to FATICO its 10% split of the premiums. Defendants have continued to underwrite those policies. However, on September 9, 2008, First American nevertheless issued a press release announcing that it was commencing "direct operations" in Colorado. Plaintiffs assert that this direct sale of First American title insurance policies in Colorado is a violation of the contract.

It is now clear that First American intends, and has already begun, to set up direct operations in Colorado. First American has also approached certain of Plaintiffs' employees, contacting the presidents of American Heritage and Security Title. Further, First American has interviewed employees of Plaintiffs who have applied for or inquired into positions that may be open with First American in Colorado. Further, Plaintiffs note that First American and its affiliates have twice been found to have tortiously interfered with the relations between Fidelity's subsidiaries and employees in other non-Colorado locations. As a result, Plaintiffs and Fidelity assert that they have undertaken considerable expense and effort to secure commitments from their employees. First American has refused to provide assurances to Plaintiff that it will not solicit Plaintiffs' employees pending a ruling on Plaintiff's Motion for Preliminary Injunction.

Turning to First American's contentions, it admits that it has opened up direct Colorado operations, and asserts that this gives title insurance customers a new option and Colorado title employees attractive new job opportunities. First American asserts that Fidelity does not want First American competing against its newly acquired

Colorado subsidiaries so it has directed them to file the motion for preliminary injunction, asking the Court to undo First American's new Colorado enterprise and force First American to send all its business to them. First American argues that the Colorado subsidiaries base their motion on a newly invented argument that the "exclusive agent" language was intended to preclude any competition in Colorado.

Until very recently, Mercury, acting through a group of operating subsidiaries, was the largest agent in the United States. For decades, due to the close business relationship between First American's Chairman Parker Kennedy and Mercury's Chairman Jerrold Hauptman, Mercury's subsidiaries, including the Colorado subsidiaries, served as the agents of FATICO under written Underwriting Agreements. First American argues that the Mercury-First American relationship proceeded as one of mutual trust, where a cooperative ethic of good faith, rather than a set of rigid contracts, governed the parties' relations.

However, in 2000, the Colorado subsidiaries fell behind in their obligation to pay FATICO its share of title insurance premiums. FACO agreed to finance the deficit, chiefly because it asserts it wanted to secure a more formal role as the primary underwriter of the Colorado subsidiaries in order to minimize risk that Mercury would end its relationship as an agent of FACO in favor of a competitor. As a result, FACO and Mercury entered an agreement in which: (1) FACO accepted $5 million in Mercury Preferred Stock for the deficit; (2) FACO made an additional $15 million in capital available to Mercury; (3) the parties amended the underwriting agreements to make FATICO the exclusive underwriter to Mercury's subsidiaries for 10 years; and (4) FACO

had the right to approve Mercury's major corporate transactions. This agreement was documented on December 29, 2000 (the "2000 Agreement") and was integrated.

The 2000 Agreement provides that Mercury (going by its former name as United Title) cannot "convey, sell, lease or otherwise dispose of ... all or any significant part of its property or assets without the written approval of FACO." (Ex. A to Wawersich Affidavit, § 8.3, Doc. # 83-47.) The parties agreed neither could assign "any of its rights, interests or obligations under the Agreement without the written approval of the other party…." (*Id.*, § 10.3.) FACO and Mercury also amended the Underwriting Agreements between FATICO and the Colorado subsidiaries to include a provision stating that for ten years each subsidiary "shall not represent any competitor of First American." (*Id.*, p. 12.) Additionally, Mercury's counsel is alleged to have prepared and directed the inclusion of the exclusivity provision (§ 9.2(b)) in the Agreements of Amendment of the Colorado Underwriting Agreements) that is at issue.

First American asserts that this Mercury-authored, exclusive agent language was not the subject of discussion that the participants can recall. The Chairman of FACO does recall, however, that there was no discussion of any restriction on direct operations of First American. Despite the signing of the 2000 Agreement, First American contends that the companies' interactions continued on the same informal basis as before. For example, at the time of the 2000 Agreement, First American has produced evidence that FATICO had multiple other agents in Colorado and that Mercury knew it. Despite the "exclusive title insurance agent" language, First American contends that Mercury did not protest when First American continued to underwrite

those agents.[1]  First American also asserts that Mercury and First American discussed, and Mercury allegedly approved, FATICO underwriting other Colorado agents that were not affiliated with Mercury, including North American, Centex, and Land Title.

In 2005, in a continued effort to ensure Mercury did not align with other underwriters, FACO asserts that it proposed a more expansive financing relationship with Mercury.  This led Mercury and FACO to discuss all aspects of their relationship, exchanging term sheets with proposals.  Mercury sent FACO a term sheet that included the following language, "Except for existing ABA arrangements (to be scheduled at closing), FACO will not engage in the direct placement of title insurance in the state of Colorado."  (Wawersich Aff. ¶ 7, Exs. B and C, Doc. # 83-56 and 83-57.)  FACO rejected that proposal.  (*Id.* ¶ 8, Ex. D, Doc. # 83-58.)  Ultimately, these discussions led to a deal in which FACO transferred $75 million to Mercury in exchange for Mercury Series B Preferred Stock.  The agreement documenting that deal did not modify the "exclusive agent" language.

After that $75 million investment, Mercury owed FACO nearly $20 million in promissory notes and $80 million in preferred stock.  Unfortunately, the real estate market then began its reversal, and so did Mercury's cooperative attitude toward FACO according to Defendants.  Since the fall of 2007, First American asserts that Mercury has been in default of most of its significant obligations to FACO including: (1) failing to pay amounts due on promissory notes; (2) failing to pay dividends on preferred stock;

---

[1]  Plaintiffs presented evidence at the hearing, however, that Mr. Hauptman of Mercury did protest to Mr. Kennedy of FACO, telling him that they needed to do something to enforce the exclusivity agreement.

(3) refusing to convert preferred stock to common stock because that would have given FACO control of Mercury; and (4) abruptly terminating subsidiary operations and leaving FACO as the underwriter to deal with the wreckage. Then in May 2008, Mercury and the Colorado subsidiaries filed this action against FACO alleging that it had breached the "exclusive agent" language of the 2000 Agreement. First American asserts that, significantly, even though FATICO's NCS Division had been engaging in direct business in Colorado, Plaintiffs did not attack that conduct in its complaint or otherwise suggest that the "exclusive agent" language extended to direct operations.

In August, First American asserts that Mercury struck the final blow. After Mercury had shut down everything except its Colorado subsidiaries, FACO and Mercury reached a deal in principle under which FACO would assume responsibility for the Colorado subsidiaries. Unbeknownst to FACO, Fidelity and Mercury struck a deal for Fidelity to buy the subsidiaries. First American asserts that Mercury knew that the deal would destroy its relationship with FACO and breach its agreement to obtain FACO's approval, so Mercury hid the details and did not seek FACO's approval.

First American contends that it was stunned to learn, via an August 5 Fidelity press release, that Mercury had sold the Colorado subsidiaries to Fidelity. Within 24 hours, FACO came to this Court, seeking a temporary restraining order ["TRO"] to stop Fidelity's purchase of the Colorado subsidiaries. FACO based its motion for TRO on Mercury's agreement to obtain First American's approval of any such sale of assets, and the Colorado subsidiaries' agreement not to represent any competitor of First American.

First American argues that Mercury's sale of the Colorado subsidiaries to Fidelity created an untenable situation. The subsidiaries, still FATICO agents, allegedly have a conflict of interest because it is in Fidelity's interest to maximize profits by cutting the expenses of title searching and policy writing. Moreover, when the Colorado subsidiaries were part of a Mercury organization that had a company-wide, good faith relationship with FACO, First American asserts that it could confidently refer title and escrow transactions from its important national customers to those Colorado subsidiaries. But now, referring those transactions to a competing underwriter's company would be competitive lunacy. Finally, the underwriter-agent relationship depends on trust. There is no trust between FACO and Fidelity. For these reasons, once Fidelity acquired the Colorado subsidiaries, First American contends that it proceeded to launch a direct operation in Colorado.

III.    ANALYSIS

A.    Preliminary Injunction Standard

A preliminary injunction is an extraordinary remedy; it is the exception rather than the rule. *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). "Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003). The primary purpose of a preliminary injunction is to preserve the status quo pending a final determination of the parties' rights. *Otero Savings and Loan Ass'n v. Fed. Reserve Bank of Kansas City, Mo.*, 665 F.2d 275, 277 (10th Cir. 1981)

"To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Urban Gorilla*, 500 F.3d at 1226. "'If the plaintiff can establish that the latter three requirements tip strongly in his favor, the test is modified, and the plaintiff may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.'" *Flowers*, 321 F.3d at 1255-56 (quotation omitted).

However, "when a preliminary injunction would alter the status quo . . . the movant bears a heightened burden and 'must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.'" *Urban Gorilla*, 500 F.3d at 1226) (quotation omitted). The movant must also meet this heightened burden as to preliminary injunctions that are mandatory as opposed to prohibitory or that afford the movant substantially all of the relief he may recover at the conclusion of a full trial on the merits. *O'Centro Espirita Beneficente Uniao de Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). As to those injunctions, courts must more closely scrutinize the injunction "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* Movants seeking such an injunction are not entitled to rely on the modified-likelihood-of-success-on-the-merits standard. *Id.* at 976.

I now turn to my analysis of the preliminary injunction motion. I first address whether the requested preliminary injunction requires a heightened burden of proof and then address irreparable injury. The Tenth Circuit has instructed that "[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (quotation omitted). I address likelihood of success last.

B.     Whether the Requested Preliminary Injunction is Subject to a Heightened Burden

First American has not engaged in direct operations in Colorado for nearly three decades. As a result, Plaintiffs argue that the motion is prohibitory and seeks only to maintain the status quo. Further, they argue that the requested preliminary injunction will not render a trial on the merits meaningless – if First American prevails at trial, it can enter the Colorado market at that time. Thus, they argue that there is not a heightened burden. First American argues, on the other hand, that this an injunction that seeks to disturb the status quo and that the effect of the injunction is mandatory. Accordingly, First American asserts that the heightened burden is applicable.

I first address whether the injunction will disturb the status quo. "[T]he status quo is 'the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing.'" *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.* 269 F.3d 1149, 1155 (10th Cir. 2001) (quotation omitted). In this case, the evidence at the hearing showed that First American did not begin to set up direct

operations in Colorado until August or September of 2008, after this controversy began. Prior to that, it is uncontested that First American had not engaged in direct operations in Colorado for nearly three decades and I find that this is what the status quo was before the controversy began. Accordingly, I find that the status quo is not disturbed by the preliminary injunction motion.

I also find that the requested preliminary injunction is prohibitory rather than mandatory. Plaintiffs request an injunction prohibiting Defendants from violating the exclusivity clause. They also ask for an order prohibiting Defendants from soliciting Plaintiffs' Colorado employees and customers. While Defendants attempt to assert that the injunction is really mandatory, I disagree. Finally, I find that the preliminary injunction that is sought by Plaintiffs does not fall within any of the other disfavored categories of injunctions, and that a heightened burden of proof does not apply.

C.    Analysis of Preliminary Injunction Factors

1.    Irreparable Injury

Plaintiffs argue that First American's impending entry into Colorado will cause irreparable injury absent injunctive relief. They assert that breach of an exclusivity clause almost always warrants the award of injunctive relief. Here, it is argued that First American's breach of the exclusivity clause will permanently damage Plaintiffs' goodwill, business reputation and viability in the Colorado market and will likely cause lay offs; Plaintiffs' market share may be substantially diminished; and Plaintiffs' ability to maintain key employees and hence customers is jeopardized. Plaintiffs further assert that the irreparable harm cannot be remedied solely by monetary damages.

First American argues, on the other hand, that Plaintiffs have not shown that they will suffer irreparable injury if First American competes in Colorado. All of Plaintiffs' claims may be reduced to money damages and they are far from certain. It is also argued that much of Plaintiffs' evidence on this issue is inadmissible because it is speculation, hearsay, and/or irrelevant.

Turning to my analysis, irreparable injury is established "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite*, 269 F.3d at 1156. The injury 'must be both certain and great,'... and ... must not be 'merely serious or substantial.'" *Potawatomi Indians*, 253 F.3d at 1250 (quotation omitted). "[I]rreparable harm is often suffered when 'the injury can[not] be adequately atoned for in money,'...or when 'the district court cannot remedy [the injury] following a final determination on the merits.'" *Id.* (quotation omitted).

The Tenth Circuit has stated that "it is clear that irreparable harm often arises from the breach of an exclusivity clause." *Dominion Video Satellite*, 356 F.3d at 1263. However, "[d]espite the general acknowledgment that irreparable harm often arises from the breach of this type of agreement, courts do not automatically, nor as a matter of course, reach this conclusion." *Id.* "Rather, they examine whether the harms alleged by the party seeking the preliminary injunction are in fact irreparable, and sometimes conclude in the negative." *Id.* (citing cases).

Thus, courts finding irreparable harm from breaches of exclusivity provisions have not rested their determinations solely on the existence and subsequent breaches

of the exclusivity provisions. "Rather, they have identified the following as factors supporting irreparable harm determinations: inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products." *Id.* (citing cases). The Tenth Circuit in *Dominion Video Satellite* concluded on this issue:

> From this litany of cases, we glean the general lesson that while irreparable harm is frequently found upon the breach of an exclusivity provision, that finding does not rest solely on the breach of the agreement and the resulting loss of exclusivity rights. Rather, the irreparable harm findings are based on such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position.

*Id.* at 1264.

I find that Plaintiffs have established that they will suffer irreparable injury if the preliminary injunction is not granted. They argue and have presented evidence that First American's breach of the exclusivity agreement will damage Plaintiffs' goodwill, business reputation and viability in the Colorado market, as roughly 20% of American Heritage's revenue and 10% of Security Title's revenue comes from customer referrals provided by First American; a number of employees will have to be laid off which, combined with earlier layoffs due to the economy, may impact Plaintiffs' ability to maintain their key employees and hence their customers; Plaintiffs' market share will be substantially diminished; and First American may hire some of Plaintiffs' key employees to support its direct operations.

While loss of business and loss of revenue may be compensable in monetary damages, I agree with Plaintiffs that other injuries it claims will be suffered if the preliminary injunction does not issue are not necessarily compensable in money damages. These include the layoffs of a large number of employees which may cause Plaintiffs not to be able to maintain other key employees, and the fact that First American may hire some of Plaintiffs' key employees. Those key employees appear to offer unique services in that they have a substantial relationship with their customers that cannot be preserved if those customers leave.

Cases that support my finding of irreparable injury include *Sandi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1381 (Fed. Cir. 2006) (affirming finding of irreparable harm where plaintiff produced evidence establishing, among other things, loss of good will and potential lay-offs of employees); *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (finding of irreparable harm was not clearly erroneous based on evidence that the insurance investigation business is based on personal contacts and a knowledge of the special needs and requirements of customers and that this suggested that it would be impossible to calculate damages) *Neways v. Mower*, 543 F. Supp. 2d 1277, 1289-90 (D. Utah 2008) (a marketing company's relationship with its distributors was found to be crucial to the success of the company's marketing program; irreparable harm found when distributors were recruited to join a competitor since the loss of key distributors network "will adversely impact Neways' competitive market position and cause other harm that is not solely compensable by monetary damages"); *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1274 (N.D. Iowa 1995) (finding irreparable harm

where loss of business from violation of non-compete clause would, among other things, likely cause layoffs).  Further, loss of good will may support a finding of irreparable injury.  *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3rd Cir. 2004); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511-12 (6th Cir. 1992).

      2.    <u>Public Interest</u>

Plaintiffs argue that the granting of a preliminary injunction will not disserve the public interest, as it will prevent Defendants from disrupting the market for title insurance in Colorado, the consumers who depend upon that market, and the employees who serve in that market.  Further, Plaintiffs argue that competition from First American would not benefit consumers as the price that consumers pay for First American policies is fixed and thus will be the same regardless of who sell them.

Defendants argue, on the other hand, that the public interest would be harmed because the preliminary injunction would reduce competition in the Colorado title insurance and closing markets.  They also argue that there is a public interest in the employment opportunity presented by First American's direct operations in Colorado.

I find that this factor favors Plaintiff.  "[T]here is a public interest in upholding enforceable contracts," and "the public interest is served where unfair competition is restrained."  *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1149-50 (D. Kan. 2007); *Mountain America Credit Union v. Godfrey*, No. 2:06-CV-481 TS, 2006 WL 2129465, at *4 (D. Utah 2006).  If Plaintiffs are successful on the merits and show that First American breached the exclusivity agreement by engaging in direct operations

here, then the public interest would favor enforcement of the contract and restraint of Defendants from unfair competition in this state.

        3.    <u>Balancing of the Hardships</u>

Plaintiffs assert that the threatened injury to them outweighs any injury to First American, and that they request only that the status quo be preserved.  Defendants have not been engaged in direct sales of First American title insurance policies in Colorado for approximately three decades.  By contrast, if injunctive relief is granted, Defendants will continue to receive remittance payments on sales of First American title insurance policies in Colorado, as they have for the past 30 years.  While the fact that FATICO's principal competitor Fidelity now owns Plaintiffs may cause First American discomfort, it does not constitute "harm" to First American.

Defendants assert, on the other hand, that balancing the hardships favors denial of the injunction.  If the injunction issues, First American will be forced to direct its national customers' title orders for Colorado property either to Fidelity-owned companies or to agents of other competing underwriters.  Moreover, First American will have to undo the Colorado enterprise FATICO has established and there will be no way to measure what business First American would have garnered had it not been enjoined.  By contrast, Defendants argue that the Colorado subsidiaries will suffer no irreparable injury from denial of the injunction.  They will still be able to compete for business and employees.

I find merit to both parties' arguments on this element.  Plaintiffs have shown that if the exclusivity clause is not enforced through a preliminary injunction and First

American is allowed to begin their direct operations in Colorado, they will immediately lose a substantial amount of their business.  As a result, they will have to begin immediate layoffs which, in this industry where layoffs are already occurring due to economic conditions, may have a substantial ripple effect on other employees and on Plaintiffs' reputation in the title industry business.  By contrast, if a preliminary injunction is issued, First American will continue to have its underwriting business in Colorado processed through Plaintiffs and will continue to receive its premiums due in connection with the policies.

However, First American will also suffer significant harm if the injunction is issued.  First, it will have to shut down its direct operations in Colorado, despite having announced that FATICO has arrived in Colorado to stay.  Having lost its momentum, it may be difficult for FATICO to re-start the effort here at later time with similar vigor, because prospective customers, business vendors and employees will question whether there will be another false start.  Further, there will be no way to measure what business First American would have garnered had it not been enjoined.

Second and more importantly, First American will have to direct its national customers' title orders for Colorado property to Fidelity, its biggest rival in the title insurance business, who now owns the Colorado subsidiaries.  This understandably creates an untenable situation for First American, as the underwriter-agent relationship depends on trust and there is no trust between First American and Fidelity.  In other words, if a preliminary injunction is issued, First American will be forced to put its most valuable relationships in the clutches of its competitors.   Finally, the Colorado

subsidiaries, still FATICO agents, now may have a conflict of interest because it may be in Fidelity's interest to maximize profits by cutting the expenses of title searching and policy writing.

Having considered the foregoing, I find that the balance of harms is evenly weighed, and thus favors denial of the injunction. Plaintiffs have not shown that the threatened injury outweighs the harm that the preliminary injunction may cause the Defendants. Accordingly, I find that Plaintiffs' Motion for Preliminary Injunction must be denied since this element has not been satisfied.

### 4. Likelihood of Success on the Merits

I also find that Plaintiffs have not shown that they are likely to succeed on the merits. Plaintiffs contend that they are likely to succeed on the merits based on the Underwriting Agreements which unambiguously prohibit First American and their affiliates from establishing direct operations in Colorado. Plaintiffs also argue that the parties' course of conduct makes clear that the parties intended the exclusivity clause to provide an exclusive right to sell in Colorado. I am not convinced for the reasons stated below that the course of conduct shows that the parties interpreted the exclusivity clause in the manner argued by Plaintiffs.

Turning to my analysis, the Colorado Supreme Court holds that "[w]hether or not an agent is entitled to commissions on goods sold by the principal within the territory specified in an agency depends upon the intention of the parties and interpretation of the contract. . . ." *Navy Gas & Supply Co. v. Schoech*, 98 P.2d 860, 861 (Colo. 1940). Indeed, "[i]t is axiomatic that a contract must be construed to ascertain and effectuate

the intent of the parties as determined primarily from the language of the contract." *East Ridge of Fort Collins, LLC v. Larimer and Weld Irrigation Co.*, 109 P.3d 969, 947 (Colo. 2005).

Colorado courts distinguish between two types of exclusive agency agreements – (1) a contract granting an "exclusive agency" to deal with specified property, and (2) a contract granting an "exclusive agency" to sell particular products in a specified territory. *Navy Gas*, 98 P.2d at 861. "'A contract to give an 'exclusive agency' to deal with specified property is ordinarily interpreted as not precluding competition by the principal personally, but only as precluding him from appointing another agent to accomplish the result.'" *Id.* By contrast, "it is well established that the grant of an 'exclusive agency' to sell, *i.e.*, the exclusive right to sell the products of a wholesale dealer in a specified territory ordinarily is interpreted as precluding competition by the principal in any form within the designated area." *Id.*; *see also Uinta Oil Refining Co. v. Ledford*, 244 P.2d 881, 884 (Colo. 1952). The court must look at the terms of the agency agreement "viewed in the light of the surrounding circumstances, as well as the manner of its interpretation by the parties." *Navy Gas*, 98 P.2d at 863.

In this case, it does appear under the above authority that the language of § 9.2(b) of the Agreement may provide Plaintiffs with an "exclusive agency" to sell First American title insurance policies in Colorado. It states, "During the term of this Agreement, Heritage, Security Title Guaranty Co., a Colorado corporation, and Title America, Inc., a Colorado corporation, ***shall be the exclusive title insurance agents*** of First American and its affiliates in the State of Colorado . . . . " (emphasis added).

However, the terms of the agreement must be viewed in light of the surrounding circumstances and the interpretation of the contract by the parties. The parties' intention is controlling. In *Navy Gas*, the court held "that the practical interpretation given to the contract by the parties while engaged in its performance and before any controversy has arisen, is one of the best indications of their true intent." *Id.*, 98 P.2d at 378-79; *see also Walter Brewing Co. v. Hoder*, 230 P.2d 170, 172 (Colo. 1951).

Defendants have presented evidence that supports their argument that the intention of the parties and the circumstances of the agreement were that the exclusivity clause was not intended to preclude direct operations from First American. First, Defendants presented evidence that FATICO performed some Colorado business directly despite the exclusivity clause and also showed that it used other agents in Colorado besides the Plaintiffs. Second, after the exclusivity agreement was in place, Mercury proposed a clause precluding "direct operations", i.e., "FACO will not engage in the direct placement of title insurance in the state of Colorado." It is arguable that Mercury recognized from this that the exclusivity clause at issue did not necessarily apply to direct operations.

Finally, Defendants presented evidence that industry practice (in the title insurance industry) is that such clauses do not preclude direct competition. Experienced persons in the title business would not have used only the words "exclusive agent" if in fact it was intended to preclude an underwriter from pursuing direct operations. The distinction between "agent" and "direct operation" is too fundamental and too well understood in the title business for that language to be

reasonably intended or interpreted to include direct operations. Defendants provided an affidavit of Robert T. "Bo" Edwards, an "independent expert on title insurance business in Colorado", that supports this. (Doc. # 83-13).

Based on that evidence, I tend to agree with Defendants that the cases relied on by Plaintiffs which involve rules regulating regional beer and petroleum distribution in the 1930s and 40s (*Navy Gas* and *Walter Brewing Co.*) should not be extended to control underwriter-agent relationships in the 21st Century. According to Defendants' evidence, the agent-underwriter relation involves personal services, trust, fiduciary duties, and most important, a clear agency-direct operation distinction. Delivering beer and gas by truck would not be comparable to that.

In conclusion, I find that Plaintiffs have not shown that they can prevail on this element. I cannot say at this stage of the litigation based on the evidence before me that it is likely Plaintiffs will succeed on the merits.

IV.    CONCLUSION

Based upon the foregoing, it is

ORDERED that Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

Dated:  November 10, 2008

<div style="margin-left:40%">

BY THE COURT:

s/ Wiley Y. Daniel_____
WILEY Y. DANIEL
Chief United States District Judge

</div>